THE HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

AARON WILLIAMS, on behalf of himself and all others similarly situated,

Plaintiff,

vs.

PILLPACK LLC,

Defendant.

NO. 3:19-cv-05282-TSZ

**PLAINTIFF'S RESPONSE TO DEFENDANT PILLPACK'S MOTION FOR SUMMARY JUDGMENT**

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

**TABLE OF CONTENTS**

Page No.

I.    INTRODUCTION ................................................................................................. 1

II.   MATERIAL FACTS ............................................................................................. 2

      A.    PillPack's form contract gave it the ability to control the calling
            campaign ............................................................................................... 3

      B.    PillPack controlled the calling campaign it hired Performance
            Media to run ......................................................................................... 4

            1.    PillPack actively managed the campaign through its liaison
                  Christie Anderson ....................................................................... 4

            2.    PillPack controlled the timing and number of calls ................. 5

            3.    PillPack approved Performance Media's use of an avatar to
                  make the calls .............................................................................. 5

            4.    PillPack approved the avatar script and its description of
                  PillPack's service ........................................................................ 6

            5.    PillPack knew that Prospects would be placing the calls for
                  the campaign ................................................................................ 6

      C.    PillPack failed to investigate complaints, instead accepting hundreds
            of leads daily ......................................................................................... 7

            1.    Consumers complained to PillPack repeatedly about the
                  prerecorded calls ......................................................................... 7

            2.    PillPack did little or nothing to investigate complaints about
                  the calls ........................................................................................ 8

            3.    PillPack converted thousands of leads to subscribers ............ 9

III.  SUMMARY JUDGMENT STANDARD & MOTION TO STRIKE ............................. 9

IV.   ARGUMENT & AUTHORITY ............................................................................ 10

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

A.  A reasonable jury could find PillPack liable on a classical agency
theory ...................................................................................................... 11

1.  A reasonable jury could find that Performance Media was
PillPack's agent ...................................................................... 11

2.  A reasonable jury could find that Prospects DM was
PillPack's subagent ................................................................ 13

3.  Performance Media and Prospects acted within the scope of
their authority ........................................................................ 14

4.  *Jones* does not preclude a finding of actual authority on
these facts .............................................................................. 16

B.  A jury could find PillPack liable under an apparent authority theory ............... 18

C.  A jury could find PillPack ratified Performance Media and Prospects'
calling activity ......................................................................................... 21

V.  CONCLUSION ........................................................................................... 24

PLAINTIFF'S RESPONSE TO DEFENDANT PILLPACK'S MOTION
FOR SUMMARY JUDGMENT - ii
Case No. 3:19-cv-05282-TSZ

Terrell Marshall Law Group PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

**TABLE OF AUTHORITIES**

Page No.

**FEDERAL CASES**

*Abante Rooter & Plumbing, Inc. v. Alarm.com,*
  2018 WL 3707283 (N.D. Cal. Aug. 3, 2018) .................................................. 24

*Abante Rooter & Plumbing, Inc. v. Arashi Mahalo LLC,*
  2019 WL 690707 (N.D. Cal. Dec. 19, 2019).................................................. 20

*Aranda v. Caribbean Cruise Line, Inc.,*
  179 F. Supp. 3d 817 (N.D. Ill. 2016) .................................................. 13, 14, 24

*Armstrong v. Investor's Business Daily, Inc.,*
  2020 WL 2041935 (C.D. Cal. Mar. 6, 2020) .................................................. 23

*Braver v. NorthStar Alarm, Servs., LLC,*
  2019 WL 3208651 (W.D. Okla. July 16, 2019) .........................................1, 11, 12, 17, 18

*Cooley v. Freedom Forever, LLC,*
  2019 WL 8126847, at *3 (D. Nev. Nov. 25, 2019) .......................................... 23

*Cooley v. v. Freedom Forever LLC,*
  2020 WL 1027149 (D. Nev. Feb. 13, 2020) .................................................. 23

*Desai v. ADT Sec. Sys., Inc.,*
  78 F. Supp. 3d 896 (N.D. Ill. 2015) .................................................. 13

*Henderson v. United Student Aid Funds, Inc.,*
  918 F.3d 1068 (9th Cir. 2019).................................................. 9, 21

*In re Monitronics Int'l,*
  2019 U.S. Dist. LEXIS 226867 (N.D. W.Va. Apr. 3, 2019).................................... 13

*Johnson v. Comodo Grp., Inc.,*
  2020 WL 525898 (D.N.J. Jan. 31, 2020) .......................................... 17

*Jones v. Royal Admin.,*
  887 F.3d 443 (9th Cir. 2018).................................................. 16, 17

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

*Knapp v. Sage Payment Sols., Inc.*,
    2018 WL 659016 (N.D. Cal. Fed. 1, 2018) .......................................................... 16, 18, 20

*Kristensen v. Credit Payment Servs.*,
    2015 WL 4477245 (D. Nev. July 20, 2015) ................................................ 15, 20, 22, 23

*Kristensen v. Credit Payment Servs.*,
    879 F.3d 1010 (9th Cir. 2018) ....................................................................................... 10

*Lushe v. Verengo Inc.*,
    2014 WL 5794627 (C.D. Cal. Oct. 22, 2014) ......................................................... 13, 14

*Lushe v. Verengo Inc.*,
    2015 WL 500158 (C.D. Cal. Feb. 2, 2015) ............................................................. 19, 20

*Mavrix Photographs, LLC v. LiveJournal, Inc.*,
    873 F.3d 1045 (9th Cir. 2017) ................................................................................ 11, 18

*Meeks v. Buffalo Wild Wings, Inc.*,
    2018 WL 1524067 (N.D. Cal. Mar. 28, 2018) ................................................................ 16

*Mey v. Pinnacle Sec., LLC*,
    2012 WL 4009718 (N.D. W.Va. Sept. 12, 2012) ........................................................... 16

*Salyers v. Met. Life Ins. Co.*,
    871 F.3d 934 (2017) ...................................................................................................... 14

*Soma Surgery Center, Inc. v. Aetna Life Ins. Co.*,
    2018 WL 1989442 (C.D. Cal. April 11, 2018) ............................................................... 13

*Thomas v. Taco Bell Corp.*,
    879 F. Supp. 2d 1079, 1085 (C.D. Cal. 2012), *aff'd*, 879 F. App'x 678
    (9th Cir. 2014) ......................................................................................................... 16, 19

**FEDERAL RULES**

Fed. R. Civ. P. 56(c)(2) ............................................................................................................. 9

PLAINTIFF'S RESPONSE TO DEFENDANT PILLPACK'S MOTION
FOR SUMMARY JUDGMENT - iv
CASE NO. 3:19-CV-05282-TSZ

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

## OTHER AUTHORITIES

*FTC Advisory Opinion/Comment Letter on Soundboard Technology*,
    2016 WL 4795392 (F.T.C. Nov. 10, 2016) ...................................................................... 17

*In re Joint Petition filed by Dish Network, LLC*,
    28 FCC Rcd. 6574 (2013) ..................................................................................... 10, 17, 20

Restatement (Third) of Agency ........................................................................................... *passim*

PLAINTIFF'S RESPONSE TO DEFENDANT PILLPACK'S MOTION
FOR SUMMARY JUDGMENT - v
CASE NO. 3:19-CV-05282-TSZ

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

## I. INTRODUCTION

PillPack hired Performance Media to make outbound calls using a prerecorded "avatar" and "live transfer" leads directly to PillPack's own call center employees. PillPack told Performance Media what to say in the calls, when to place the calls, and dictated the volume of the calls. Performance Media passed PillPack's instructions directly to Prospects DM, a call center that Performance Media hired to physically place the calls. Prospects DM did exactly what PillPack instructed, live transferring to PillPack hundreds of calls each day. PillPack's motion is premised on it not knowing Prospects DM was making the calls and it having no "day to day involvement" with Performance Media. Dkt. 82 at 20:20-22. These "facts" are disputed. PillPack's liaison with Performance Media testified that PillPack knew about Prospects and documents back her up. PillPack employees exchanged hundreds of emails with Performance Media and the liaison regarding operation of the campaign.

At least one court has granted the <u>plaintiff</u> summary judgment on nearly identical facts, holding the defendant vicariously liable for avatar calls placed by an entity affiliated with Prospects. *See Braver v. NorthStar Alarm, Servs., LLC*, 2019 WL 3208651, at *7-14 (W.D. Okla. July 16, 2019). As in *Braver*, Plaintiff alleges that PillPack is vicariously liable for Performance Media and Prospects DM's TCPA violations based on three theories: (1) express or implied actual authority; (2) apparent authority; and (3) ratification. The Court need only find issues of fact on one theory to deny summary judgment, but PillPack fails to prove it is entitled to judgment as a matter of law on any theory. The contract between Performance Media and PillPack expressly authorized the calls and granted PillPack the ability to control the calls' substance, timing, and volume. The evidence shows PillPack did just that.

A jury also could find that consumers believed PillPack authorized Prospects DM to call based on manifestations that are "traceable" to PillPack; namely, the avatar's PillPack-approved script and the statements by PillPack employees who received the transfers. Nor has PillPack demonstrated an absence of material facts as to ratification; to the contrary, the

**Terrell Marshall Law Group PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  evidence shows that PillPack ratified unlawful calls by accepting the benefits of the calls

2  despite receiving many complaints about them. PillPack's motion should be denied.

3  **II. MATERIAL FACTS**

4       PillPack sells a distinctive pharmacy service known as multi-packing. Multi-packing

5  means pre-sorting a patient's different medications into individual time-of-day packets. Ex. 1

6  (Ranneberg Dep.) at 21:17-22:13.[1] PillPack signed up new subscribers through telemarketing,

7  TV advertising, and online marketing. PillPack ran "lead generation" (or "lead gen")

8  telemarketing campaigns where its partners made outbound calls and then live transferred

9  consumers to its PPAC call center. *Id.* at 56:17-57:18.

10       Tyler Hunt, PillPack's Growth and Acquisitions Media Manager, set up and managed

11  lead gen campaigns until October 2018. Dkt. 63 ¶ 1. Hunt reported to Teague McKnight, the

12  Vice President of Acquisition Marketing. Ex. 2 (McKnight Dep.) at 38:16-39:7. McKnight and

13  PillPack's Chief Business Officer Geoff Swindle previously worked together at Swindle's

14  company, Alliance Health Networks, which was sued for TCPA violations. *Id.* at 17:7-18:23; Ex.

15  3 (Swindle Dep.) at 9:19-22, 73:22-25.

16       In early 2018, Christie Anderson, who served as a liaison between PillPack and its lead

17  gen partners, introduced Hunt to Mark Dorf and his company Performance Media Strategies.

18  *Id*. at 31:2-13. Anderson made the introduction to further "PillPack's goal" of driving

19  "additional leads to its call center in order to increase sales of its pharmacy products and

20  services." Dkt. 34 ¶ 4. After an initial test campaign in March and April 2018, PillPack

21  approved on ongoing campaign with Performance Media making calls on its behalf. *Id.* ¶ 5. Ex.

22  4 (Anderson Dep.) at 67:18-25. Dorf advised Hunt at the outset that Josh Grant and his

23  company Prospects would place the calls using an Avatar. Dkt. 34 ¶ 7; Ex. 5 (Dorf made

24  Pillpack "aware of ProspectsDM" multiple times in phone calls).

25       In October 2018, PillPack transitioned management of its lead gen campaigns,

26  ---

27  [1] Unless otherwise noted, exhibits and paragraph citations refer to the Declaration of Jennifer Rust Murray.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

including the PillPack Performance Media campaign, to Anja Ranneberg, PillPack's VP of Customer Acquisition. Dkt. 85 ¶ 1. The PillPack Performance Media campaign continued until June 2019. Ex. 1 at 23:17-18.

**A.    PillPack's form contract gave it the ability to control the calling campaign.**

PillPack's Chief Business Officer signed the contract with Performance Media authorizing the campaign. Dkt. 37-13 ("contract"). The contract is a form agreement drafted by PillPack. ███████████████████████████████████████████████

████████████████████ *Id.* (Exhibit A ¶ 4). ████████████████████████████████

████████████████████████████████████████████ *Id.; see also* Ex. 3 at 116:25-117:9. ████████████

█████████████████████████████████████████████████ Dkt. 37-13 (Exhbit A ¶ 3).

Under the contract, ███████████████████████████████████████████████████████

██████████████████████████████ *Id.* (Exhibit A ¶ 1).

    █████████████████████████████████████████████████

██████████████████████████ . *Id.* (Terms and Conditions ¶ 4(g)). ███████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████ *Compare* Dkt. 37-15 at PP_000872

(redline revision proposed by Dorf) *with* Dkt. 37-13 (Terms and Conditions ¶ 4(g) (executed contract including Dorf's revision). ███████████████████████████████████████

████████████████████████████████████████████████████████████████████

*Compare* Dkt. 37-15 at PP_000869 *with* Dkt. 37-13 (Exhibit A ¶ 1). Although PillPack generally required such verifications—called "trusted forms"—to ensure that valid TCPA consent was obtained for calls selling PillPack services, Ex. 3 at 203:7-11, PillPack did not impose the verification requirement on Performance Media because Performance Media was dialing "under its own DBA". Ex. 2 at 103:20-104:22; Ex. 3 at 204:18-24. PillPack knew the websites

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  Performance Media used to obtain purported consent did not list PillPack or Performance

2  Media as a company the consumer agreed to receive calls from. Ex. 3 at 96:24-97:13.

3  **B.    PillPack controlled the calling campaign it hired Performance Media to run.**

4      When it hired Performance Media as a lead gen partner, PillPack intended for

5  "Performance Media to be calling and transferring those calls into PillPack as an inbound

6  transfer." *Id*. at 98:8-10, 98:24-99:2, 100:9-14.

7      1.    PillPack actively managed the campaign through its liaison Christie Anderson.

8      According to PillPack, Anderson introduced PillPack to Performance Media, helped

9  with budgeting, reviewed call data about the campaign Performance Media ran for PillPack,

10  and interfaced with Performance Media. *Id.* at 31:8-13.

11      PillPack relied on Anderson to assist in managing the campaign. Anderson traveled to

12  Boston to meet with Ranneberg in person two or three times, and the two had standing calls

13  about management of PillPack's lead gen partners. Ex. 1 at 33:8-12, 36:14-20. Ranneberg set

14  the monthly budget for Performance Media's campaign. *Id.* at 45:11-13. She considered

15  Anderson's budget recommendations and relied on Anderson to convey budget information

16  to Performance Media. *Id.* at 46:6-21. Ranneberg also received weekly billing statements from

17  Performance Media, which she reconciled with PillPack's own data and approved for

18  payment. *Id.* at 94:5-15.

19      Anderson received regular reports from PillPack's internal reporting system that she

20  reviewed and used to make recommendations and track whether the campaign was

21  "performing okay for PillPack." *Id.* at 46:22-47:1; Ex. 4 at 51:12-52:6. Ranneberg valued

22  Anderson's input. Ex. 1 at 49:17-50:4, 78:22-80:6; Ex. 6.

23      PillPack employees exchanged with Dorf and Anderson hundreds of emails about the

24  campaign. Murray Decl. ¶ 23. Dorf relayed PillPack's instructions to Prospects and Prospects

25  followed them. Ex. 7 (lengthy exchange showing coordination of calling hours based on

26  PillPack's schedule and Prospects' inability to change hours for calls without PillPack consent);

27

PLAINTIFF'S RESPONSE TO DEFENDANT PILLPACK'S MOTION
FOR SUMMARY JUDGMENT - 4
CASE NO. 3:19-CV-05282-TSZ

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  Ex. 8; Ex. 9 (Dorf gives Grant the DNIS supplied by PillPack for campaign); Ex. 10 (Dorf sends

2  Grant request for call recordings from Hunt); Ex. 11 (Dorf directs Prospects to do a blind

3  transfer because PillPack agents are complaining about "John" the robot); Ex. 12 (Anderson

4  advised Dorf that PillPack increased daily allocation to 300 calls per day, Dorf forwards to

5  Grant, who says he will "get agents added today and tomorrow" to increase call volume).

6       2.     PillPack controlled the timing and number of calls.

7       PillPack and Performance Media coordinated on the live transfer lead gen campaign.

8  For example, PillPack owned and operated the number Prospects used to transfer calls to

9  PillPack's call center. Dkt. 63 (Hunt Decl. ¶ 2). Prospects could only make outbound calls and

10 transfers during hours the PPAC call center was staffed to accept the calls and PillPack

11 controlled the timing and volume of calls. Dkt. 76 (directing Dorf to send set number of calls

12 to PillPack call centers); Ex. 4 at 71:3-72:4; Ex. 13 (directing Dorf to "pull back on overall

13 volume by around 20%"); Ex. 14 (directing Dorf to "drive about 100 more leads on Saturdays,

14 between 8AM and 2PM MT"); Ex. 15 (directing lead gen partners not to deliver leads on

15 Memorial Day because "PPAC will likely be closed"). To respond to PillPack's call volume

16 directives, Dorf would "[i]ncrease his outbound calling volume or his numbers or adjust his

17 outbound calling volume to generate [the] number of transfers." Ex. 4 at 72:15-24.

18       3.     PillPack approved Performance Media's use of an avatar to make the calls.

19       PillPack hired Performance Media to make outbound calls using an "avatar" to play

20 prerecorded voice messages. Ex. 3 at 70:25-71:12, 148:8-10 (PillPack knew Performance

21 Media used "voice recordings"); Dkt. 30-23 (Seastrand Dep.) at 89:11-91:3 (PillPack hired

22 Performance Media to make prerecorded voice calls and transfer qualified leads to PillPack).

23 Tyler Hunt knew from the outset that the calls would be placed using an avatar. Dkt. 30-20;

24 Dkt. 30-21; Dkt. 75. PillPack directed Performance Media to use an offshore call center to

25 make the robocalls "to keep the cost down." Ex. 8. No one at PillPack disagreed that

26 recordings of the prerecorded voice calls Dorf provided were "exactly as ordered" by PillPack.

27

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Dkt. 30-26.

4.     PillPack approved the avatar script and its description of PillPack's service.

PillPack exercised its authority under the contract to approve scripts and messaging in advance. Ex. 2 at 112:1-113:18; Ex. 3 at 113: 24-15, 153:16-25. PillPack had standard language that it required partners to use to communicate "what PillPack is" and its distinctive multi-packing service. Ex. 2at 66:17-68:13.

Prospects DM drafted the campaign script based on information from PillPack. Ex. 8. Dorf sent Anderson Prospects' script with the file name "PDM PILLPACK SCRIPT" and Anderson responded: "This script has been approved by Tyler." Dkt. 30-24 at BYTE-SUCCESS_000011-12. PillPack expected Performance Media to use the approved script. Ex. 2 at 109:25-110:21. And the script conveyed PillPack's messaging on its multi-packing service. *Id*. at 108:13-109:3; Ex. 1 at 122:4-17.

5.     PillPack knew that Prospects would be placing the calls for the campaign.

Tyler Hunt says he was "not aware" that Prospects was working with Performance Media or transferring calls to PillPack. Dkt. 63 ¶ 5.[2] But Anderson testified that she participated in telephone conversations where Dorf introduced Josh Grant and his company Prospects and told Hunt that Prospects would be placing the calls. Ex. 4 at 47:12-16, 124:10-12. Anderson produced two calendar invitations showing Grant's @prospectsdm.com email address. *Id*. at 122:15-123:4; Ex. 16. Anderson was directly involved in the campaign from beginning to end and has no interest in the outcome of this case.

Early in the campaign, Dorf emailed Hunt saying "Josh" had reviewed recordings of calls transferred to PillPack and provided feedback. Dkt. 74. Hunt responded that he would train PillPack's call center agents based on the feedback and didn't question who Josh was or

---

[2] While he admits talking to "someone from Performance Media's call center," he doesn't say whether it was Josh Grant. Dkt. 63 ¶ 3. Nor does he deny approving Performance Media's use of an avatar and offshore call center. *Id.* Indeed, there is no record evidence that Performance Media had its own call center or that it worked with any call center other than Josh Grant and Prospects DM.

PLAINTIFF'S RESPONSE TO DEFENDANT PILLPACK'S MOTION
FOR SUMMARY JUDGMENT - 6
CASE NO. 3:19-CV-05282-TSZ

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    why he was listening to call recordings. *Id.*

2    **C.     PillPack failed to investigate complaints, instead accepting hundreds of leads daily.**

3        1.    <u>Consumers complained to PillPack repeatedly about the prerecorded calls.</u>

4        PillPack received numerous consumer complaints about the campaign's live-

5    transferred calls. Ex. 1 at 54:3-56:19. PillPack maintained a "Bad Transfer List" that PPAC call

6    center agents used to record problems with partner leads. Ex. 3 at 17:17-19. PillPack's Chief

7    Business Officer thinks it significant that PPAC call center agents did not record a complaint

8    about TCPA violations. *Id.* at 66:8-22. But when Prospects transferred Mr. Williams to PillPack,

9    he told PillPack that the prerecorded voice call he received was "very, very illegal and you can

10   be sued." Dkt. 64 at 40. That complaint was not recorded in any of PillPack's systems. PillPack

11   created the Bad Transfer List in October 2018—it did not document complaints about live

12   transfer calls before that. Ex. 1 at 167:24-168:25. Also, PPAC agents would often "reach out

13   directly, mostly through the Slack messaging service" about complaints. Dkt. 30-23 (Seastrand

14   Dep. at 157:2-19). PillPack maintains those messages cannot be searched for or produced.

15   Murray Decl. ¶ 24.

16       The Bad Transfer List contains 5,466 calls designated "bad transfers" between October

17   2018 and July 30, 2019. *Id.* at ¶ 25. Ranneberg thought PillPack could not tie complaints on

18   the Bad Transfer List to a particular vendor. But PillPack's Five9 system recorded the numbers

19   transferred on each lead gen partner's DNIS and the timestamp. Ex. 1 at 169:18-171:13.

20   Ranneberg never asked anyone to match the numbers on the Bad Transfer List to the

21   numbers transferred on a particular lead gen partner's DNIS. Plaintiff's counsel's paralegal

22   was able to do this in fifteen minutes. Murray Decl. ¶ 26. PPAC agents coded hundreds of calls

23   transferred on the Performance Media DNIS as "customer didn't want to be transferred." *Id*.

24   Examples of the complaints PPAC agents recorded from consumers transferred by Prospects

25   on the Performance Media DNIS include:

26       • "apparently the IVR keeps calling and transferring her to us even though shes

27

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

[sic] told us a few times isnt [sic] interested" [Ex. 17 at line 291].

- "how do you tell a robot I already talked to pillpack and can't use there [sic] service?"[*Id.* at line 2535].

- "STATED HE DOES NOT WANT TO GO WITH OUR SERVICE DUE TO US BEING PARTNERED WITH "JOHN" THE ROBOT." [*Id.* at line 3586].

During an 18-day period in March 2019, PillPack received at least 343 do-not-call requests from customers live transferred by Performance Media. Ex. 1 at 104:10-15.

Consumers that Prospects called understood that PillPack had called them. PillPack admits that after a consumer was transferred, its call center employees "announced its identity." Dkt. 82 at 25:16-17. When PillPack call center agents asked "how can I help you today," consumers responded, "I don't know, you tell me . . . somebody called me and they then sent me to you" or "I don't know they connected me to you so." Dkt. 30-27 at 3-4.

2. <u>PillPack did little or nothing to investigate complaints about the calls.</u>

PillPack's Rule 30(b)(6) designee could not identify any investigation or due diligence PillPack did to confirm that Performance Media obtained consent before calling consumers using an avatar. Ex. 3 at 90:1-15. PillPack did not audit Performance Media. *Id*. at 54:11-23. After PillPack received a large volume of do-not-call requests from leads transferred by Prospects, Ranneberg raised the issue with Dorf, but "did not do any investigation" into whether Dorf had consent to call those consumers. Ex. 1 at 155:16-158:20. She did not consider that to be her responsibility. *Id*. at 155:22-156:5. Even after Plaintiff filed this lawsuit, PillPack did not ask Mr. Dorf whether Performance Media called Williams, what voice technology was used on the call, or for documented evidence that Plaintiff consented to be called. *Id*. at 124:8-128:23.

PillPack did not investigate which lead gen partner was the source of complaints on the Bad Transfer List because it was "really difficult" to do. *Id*. at 62:19-25. PillPack asked Performance Media about consumer complaints about robocalls. Ranneberg accepted Dorf's

PLAINTIFF'S RESPONSE TO DEFENDANT PILLPACK'S MOTION
FOR SUMMARY JUDGMENT - 8
CASE NO. 3:19-CV-05282-TSZ

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  assurance that the problem wasn't on his end, even though she didn't expect to Dorf to admit

2  to any problem with the leads he sold. *Id.* at 63:23-65:24.

3      Hunt declares that he was unaware of complaints that leads transferred by

4  Performance Media did not consent to be called. Dkt. 63 at ¶ 4. But he did know about

5  complaints. Dkt. 30-23 (Seastrand Dep. at 157:20-158:2) (PPAC call center agents complained

6  directly to Hunt). Hunt does not say whether he investigated any complaints.

7      3.    PillPack converted thousands of leads to subscribers.

8      The Performance Media PillPack campaign generated a "consistent stream of leads,"

9  many of whom became customers. Ex. 1 at 147:6-12. PillPack carefully tracked the number of

10  subscribers signed up from leads transferred by Performance Media and was concerned when

11  conversion rates dropped because Performance Media "represented 35%" of PillPack's

12  inbound leads each month. Ex. 18. PillPack sold its service to more than ▮▮▮▮ people

13  transferred to it by Performance Media from September 2018 through June 2019. Dkt. 37-4.

14  When PillPack finally ended its relationship with Performance Media, it did so not because of

15  any concern about TCPA violations, but because PillPack wanted to change its strategy to

16  "generate new customers at a lower cost per acquisition." Ex. 1 at 164:16-22; Ex. 3 at 37:1-4.

17      **III.  SUMMARY JUDGMENT STANDARD & MOTION TO STRIKE**

18      Only where "the movant shows that there is no genuine dispute as to any material fact

19  and the movant is entitled to judgment as a matter of law" should a court grant a motion for

20  summary judgment. Fed. R. Civ. P. 56(a). The court views the facts "as a whole and in the light

21  most favorable to the party opposing the motion." *Henderson v. United Student Aid Funds,*

22  *Inc.*, 918 F.3d 1068, 1071 (9th Cir. 2019). Facts must be "presented in a form that would be

23  admissible in evidence." Fed. R. Civ. P. 56(c)(2).

24      Plaintiff moves to strike paragraph 2 of Anja Ranneberg's declaration purporting to

25  describe "PillPack's" knowledge and understanding. Dkt. 85 ¶ 2; Dkt. 82 at 10:5-20. PillPack

26  did not designate Ranneberg to testify under Rule 30(b)(6) and her statements are not based

27

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    on personal knowledge. For example, the declaration describes "PillPack's" understanding of

2    what Performance Media would do under the PillPack contract. Dkt. 85 ¶ 2. But the campaign

3    ran for months before Ranneberg got involved. And she testified repeatedly that she never

4    read the contract and did not even know where to find it. Ex. 1 at 25:20-26:10, 65:25-66:6,

5    138:3-15, 139:18-20, 149:19-23. The declaration purports to state PillPack's knowledge of the

6    campaign (Dkt. 85 ¶ 2), but Ranneberg testified that she didn't know Hunt's role in

7    establishing the campaign and she never talked to Hunt about the campaigns. Ex. 1 at 43:19-

8    45:4. Ranneberg cannot testify about PillPack's knowledge of these facts, only her own.

9                    **IV. ARGUMENT & AUTHORITY**

10        It is undisputed that PillPack did not directly place the illegal telemarketing calls at

11    issue here. Plaintiff instead alleges that it can be held vicariously liable. The FCC's 2013 ruling

12    in *Dish Network* governs vicarious liability under the TCPA. *Kristensen v. Credit Payment Servs.*,

13    879 F.3d 1010, 1014 (9th Cir. 2018). In *Dish*, the FCC explained that companies that can stop

14    TCPA violations but fail to do so may be vicariously liable for those violations because "the

15    seller is in the best position to monitor and police TCPA compliance by third-party

16    telemarketers[.]" *In re Joint Petition filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6588 (2013).

17    Seller liability "give[s] the seller appropriate incentives to ensure that their telemarketers

18    comply with [the FCC's] rules." *Id.* Allowing a seller "to avoid potential liability by outsourcing

19    its telemarketing activities to unsupervised third parties," would leave consumers "in many

20    cases without an effective remedy for telemarketing intrusions" particularly "if the

21    telemarketers were judgment proof, unidentifiable, or located outside the United States, as is

22    often the case." *Id*.

23        Companies may be held vicariously liable for TCPA violations under common law

24    agency principles set out in the Restatement (Third) of Agency, including (1) "classical"

25    agency; (2) apparent authority; and (3) ratification. *Id.* at 6586-87. The Court should deny

26    summary judgment, if it finds genuine issues of fact that are material to any of the theories.

27

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1   *See Braver*, 2019 WL 3208651, at *12. Here, a jury could find PillPack liable on all three.

2   **A.**    **A reasonable jury could find PillPack liable on a classical agency theory.**

3         Classical agency first requires a finding of an agency relationship. "Agency is the

4   fiduciary relationship that arises when one person (a 'principal') manifests assent to another

5   person (an 'agent') that the agent shall act on the principal's behalf and subject to the

6   principal's control, and the agent manifests assent or otherwise consents so to act." *Mavrix*

7   *Photographs, LLC v. LiveJournal, Inc.*, 873 F.3d 1045, 1054 (9th Cir. 2017) (quoting

8   Restatement (Third) of Agency ("Restatement") § 1.01). The principal must have the "right to

9   control" the actions of the agent. Restatement § 1.01, cmt c.

10         1.    <u>A reasonable jury could find that Performance Media was PillPack's agent.</u>

11         PillPack does not seriously dispute that Performance Media was its agent, nor could it.

12   The contract ████████████████████████████████████████████

13   ███████████████ Dkt. 37-13 at Exhibit A ¶ 3 (Performance Media ████████

14   ███████████████████████████████████████████████

15   ██████████, Exhibit A ¶ 1 (Performance Media ████████████████

16   ███████████████████████████████████████████████

17   ███████████████████████████████████████████

18   █████ and all ████████████████████████████████

19   ████████████████████, Terms and Conditions ¶ 1(b) (PillPack ███████

20   ███████████████████████████████████████████████

21   █████████████████████████████████████

22   ███████████████████████████████.

23         PillPack could control Performance Media's compliance with the TCPA. The contract

24   required Performance Media ████████████████████████████████████

25   ████████████████ and to ████████████████████████████

26   ████████████████████████ *Id.*, Terms and Conditions ¶ 4(g). The contract also

27

**Terrell Marshall Law Group PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
Tel. 206.816.6603 • Fax 206.319.5450
www.terrellmarshall.com

1  required Performance Media to ███████████████████████████████████

2  ████████████████████████████████████████████████████████

3  ███████████████████████████ *Id.* And the contract required Performance Media to

4  ████████████████████████████████████████████████

5  ██████████████████████████████████████████████████████████

6  ██████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████ *Id.,*

8  Terms and Conditions ¶ 4(h). By signing the contract, Performance Media manifested assent.

9      The contract says that Performance Media is an "independent contractor," but an

10  independent contractor "may or may not be an agent." Restatement § 1.01, cmt. c. The

11  cornerstone of agency is whether the agent "enter[s] into transactions on the principal's

12  account." *Id.* Performance Media did exactly that when it hired Prospects to call potential

13  PillPack customers using soundboard technology to deliver a PillPack-approved script that

14  described PillPack's unique multi-packing service, including payment terms, and obtain

15  permission to transfer the potential customers to PillPack's call centers. PillPack controlled the

16  timing, and volume of the calls. Dkt. 63 ¶ 2; Dkt. 76; Ex. 4 at 71:3-72:4, 72:15-24; Exs. 13-15;

17  *see also* Exs. 7-12. PillPack actively managed the campaign, directing budgeting and

18  performance. Ex. 1 at 33:8-12, 36:14-20, 45:11-3, 46:6-21, 94:5-15; PillPack not only knew that

19  avatar technology was being used, it directed Performance Media to improve it. Ex. 3 at

20  70:25-71:12, 148:8-10; Dkt. 30-23 at 89:11-91:3; Dkt. 30-20; Dkt. 30-21; Dkt. 75; Ex. 11.

21  PillPack provided information for the script and approved the script that Prospects drafted. Ex.

22  1 at 122:4-17; Ex. 2 at 66:17-68:13, 108:13-109:3, 109:25-110:21, 112:1-113:18; Ex. 3 at 113:

23  24-15, 153:16-25; Ex. 8; Dkt. 30-24 at BYTE-SUCCESS_000011-12.

24      This evidence is sufficient to create an issue of fact for the jury on whether

25  Performance Media was PillPack's agent. *See Braver v. NorthStar Alarm Servs., LLC*, 2019 WL

26  3208651, at *11–12 (W.D. Okla. July 16, 2019) (finding agency where defendant hired third

27

PLAINTIFF'S RESPONSE TO DEFENDANT PILLPACK'S MOTION
FOR SUMMARY JUDGMENT - 12
CASE NO. 3:19-CV-05282-TSZ

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

party to place calls, was involved in drafting script, knew an avatar was used, received live

transfers, and provided purported agent regular reports); *In re Monitronics Int'l,* 2019 U.S.

Dist. LEXIS 226867, at *34 (N.D. W.Va. Apr. 3, 2019) (substantial evidence of control over

defendant's dealers' sales tactics, including the provision of scripts and leads confirms agency

and raises a jury issue on vicarious liability);*Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp.

3d 817, 832 (N.D. Ill. 2016) (factfinder could infer seller authorized campaign from

involvement in drafting and editing the script); *Lushe v. Verengo Inc.*, 2014 WL 5794627, at

*5–6 (C.D. Cal. Oct. 22, 2014) (triable issue of fact on classical agency where defendant

reviewed, edited, and provided input for script, communicated with caller about call quality,

provided access to dedicated phone lines for call transfers, plus evidence caller used an ATDS).

> 2. A reasonable jury could find that Prospects DM was PillPack's subagent.

Rather than directly dispute that Performance Media was its agent, PillPack argues

that *Prospects* could not be its agent because PillPack did not contract with Prospects and

could not have controlled Prospects DM's calling. But PillPack ignores the "well-established

legal principle" of subagency. *See Soma Surgery Center, Inc. v. Aetna Life Ins. Co.*, 2018 WL

1989442, at *2 (C.D. Cal. April 11, 2018) (citing Restatement § 3.15). A subagent is a person

"appointed by an agent to perform functions that the agent has consented to perform on

behalf of the agent's principal and for whose conduct the appointing agent is responsible to

the principal." *Aranda*, 179 F. Supp. 3d at 832 (quoting Restatement § 3.15). An agent may

appoint a subagent where the agent "reasonably believes, based on a manifestation from the

principal, that the principal [expressly or impliedly] consents to the appointment of a

subagent." *Desai v. ADT Sec. Sys., Inc.*, 78 F. Supp. 3d 896, 904 (N.D. Ill. 2015).

The evidence shows that Performance Media reasonably believed PillPack consented

to Performance Media appointing Prospects to place the calls. ████████████████

████████████████████████████████████████████ *See, e.g.,* Dkt. 37-13 at

Terms & Conditions ¶¶ 4(a), 4(d), 4(e), 4(h), 6(a). Ms. Anderson testified that PillPack knew

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  Performance Media appointed Prospects to place calls. Ex. 4 at 122:15-124:12. Anderson's

2  calendar invitations confirm this. Ex.16. So does Dorf. Ex. 5. Email correspondence and other

3  documents support Anderson's testimony. Dkt. 74; Ex. 4 at 56:6-59:5. This evidence raises a

4  genuine issue of material fact as to whether PillPack expressly or impliedly authorized

5  Performance Media to retain Prospects DM to place the calls. *See Lushe*, 2014 WL 5794627, at

6  *5 (evidence that agent was "outsourcing the placement of calls" raised issue of fact as to

7  whether defendant authorized agent to "engage a subcontractor" and "accepted the legal

8  consequences of that").

9         3.     <u>Performance Media and Prospects acted within the scope of their authority.</u>

10       When an agency relationship exists, the next step is to determine whether the agent

11  acted within the scope of its authority, which may be implied by conduct and proven

12  circumstantially. Restatement § 2.02, cmt. c. "While express actual authority is proven

13  through words, implied actual authority is established through circumstantial evidence." *Id.* "A

14  principal grants implied actual authority to an agent when the principal's reasonably

15  interpreted words or conduct would cause an agent to believe that the principal consents to

16  have an act done on her behalf." *Aranda*, 179 F. Supp. 3d at 831; Ex. 19 (Final Jury Instructions

17  at 5-6), *Krakauer v. Dish Network L.L.C.*, No. 1:14-cv-00333-CCE-JEP (N.D. W.Va. Jan. 19, 2017),

18  ECF No. 293); *see also Salyers v. Met. Life Ins. Co.*, 871 F.3d 934, 940 (2017).

19       Ample evidence shows Performance Media and Prospects DM acted within the scope

20  of their authority. The contract between PillPack and Performance Media directed

21  Performance Media to "place and transfer qualified leads to PillPack." Dkt. 37-17 ¶ 6. PillPack

22  dictated the calls' substance, volume, and timing. Performance Media communicated that

23  information to Prospects. There is no evidence that Prospects deviated from the script or

24  PillPack's instructions to Performance; instead, the calls were "exactly as ordered" by PillPack.

25  Dkt. 30-26.

26       PillPack impliedly authorized Performance Media and Prospects to place calls without

27

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

verifying that they had prior express written consent as the TCPA requires. Despite generally requiring "trusted form" verifications of TCPA consent, PillPack "did not deploy [its] trusted form" here because Performance Media "was generating their own leads under their own DBA." Ex. 3 at 203:7-11, 204:15-24. As a result, ███████████████████████████████ ███████████████████████████████████████████████████████████████ █████ Dkt. 37-15 at PP_000869.

PillPack relies on *Kristensen*, but there the Ninth Circuit addressed only agency by ratification. 879 F.3d at 1013–15. Even in the trial court, the plaintiff did not argue actual authority and subagency. *Kristensen v. Credit Payment. Servs.*, 2015 WL 4477245, at *3 (D. Nev. July 20, 2015) (plaintiff argues "ratification," "apparent authority," and "control and benefit").

More importantly, there was no direct connection between the entity sending the texts and the defendants in *Kristensen*. Instead, online lenders purchased leads from a "lead store" which in turn contracted with a company called Click Media that ordered leads from a company called AC Referral. 2015 WL 4477245, at *1. AC Referral then sent out an advertising text. *Id.* Clicking the link in the text took the potential customer to Click Media. *See id.* Only by completing an online application would the potential customer be redirected to the defendant online lenders. *Id.* AC Referral "had no contact" with the online lenders; "its representatives had not even heard of these companies before the lawsuit was filed." *Kristensen*, 879 F.3d at 1013. The named plaintiff never clicked on the link in the text, never filled out the application, and never engaged with Click Media or the online lenders. *Kristensen*, 2015 WL 4477245, at *2. Because there was no connection between AC Referral and the defendants, the Ninth Circuit found that AC Referral was not the lenders' "agent" and the texts were not "ratifiable acts." *Kristensen*, 879 F.3d at 1014-1015. By contrast, Prospects transferred potential customers directly to PillPack's call centers. Prospects communicated directly with Hunt and Anderson about PillPack, and Dorf forwarded PillPack's instructions to

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Prospects, which carried them out. *Kristensen* simply does not govern.

*Thomas v. Taco Bell Corp.* is likewise inapposite because Taco Bell was far removed from the decision to engage in marketing efforts via text messages. 879 F. Supp. 2d 1079, 1085 (C.D. Cal. 2012), *aff'd*, 879 F. App'x 678 (9th Cir. 2014). Taco Bell's involvement consisted of funding a separate legal entity that managed and controlled its marketing and hired the vendors who designed the marketing campaign that sent unlawful texts. *Id.* at 1081-82. Taco Bell did not request or approve the marketing campaign that resulted in the unlawful texts, nor did it develop or approve the message. *Id.* at 1085. In contrast, PillPack hired Performance Media to generate leads, established, owned and maintained the phone number used for the live transfers, approved the campaign script, actively managed the campaign, including the call timing and volume, regularly communicated with Dorf both directly and through its liaison Anderson, and had its own call center employees market its services directly to the transferred leads.

None of the remaining cases PillPack cites support its contention that it lacked sufficient control over Prospects DM's calling activity to confer actual authority. *See Meeks v. Buffalo Wild Wings, Inc.*, 2018 WL 1524067, at *6 (N.D. Cal. Mar. 28, 2018) (plaintiff did not allege that defendant Yelp had any control over its co-defendant's texts and the record showed the co-defendant dictated whether and when texts were sent); *Mey v. Pinnacle Sec., LLC*, 2012 WL 4009718, at *5 (N.D. W.Va. Sept. 12, 2012) (defendant purchased leads from outside vendors but had little to no control over the means or manner vendors used to generate leads); *Knapp v. Sage Payment Sols., Inc.*, 2018 WL 659016, at *3 (N.D. Cal. Fed. 1, 2018) (defendant did not have the right to set quotas for the number of calls or control the hours the lead generator worked).

4.    *Jones* does not preclude a finding of actual authority on these facts.

Relying on *Jones v. Royal Administration*, 887 F.3d 443 (9th Cir. 2018), PillPack asserts that actual authority "cannot extend liability for a TCPA violation to the principal where the

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

contract between the principal and its agent expressly prohibits TCPA-violating calls." Dkt. 82

at 18-21. But in *Jones* there was no "record evidence contradicting this limitation on [the

agent's] authority." 887 F.3d at 489. The evidence here shows PillPack impliedly authorized

Performance Media to violate the TCPA. PillPack hired Performance Media to place calls

PillPack knew would be made using prerecorded voice technology without verifying

Performance Media had prior express consent. Ex. 3 at 70:25-71:12, 148:8-10; Dkt. 30-23 at

89:11-91:3; Dkt. 30-20; Dkt. 30-21; Dkt. 75. PillPack took the risk in permitting these calls

when it should have known these calls likely violate the TCPA. *See FTC Advisory

Opinion/Comment Letter on Soundboard Technology*, 2016 WL 4795392 (F.T.C. Nov. 10, 2016).

Courts have since confirmed that they do. *See Braver*, 2019 WL 3208651, at *6; *Johnson v.

Comodo Grp., Inc.*, 2020 WL 525898, at *7-8 (D.N.J. Jan. 31, 2020). The contract in *Jones*, by

contrast, prohibited "robo-calling." 887 F.3d at 446–47 (agreement excluded from authorized

marketing methodologies "any act or omission that violates applicable state or Federal law,

including but not limited to 'robo-calling'").

Extending *Jones* to any case where the contract generally prohibits an alleged agent

from violating the TCPA would allow principals to evade the TCPA with generic contract

provisions even when—as here—the principal makes no effort to ensure the requirement is

enforced and, in fact, directs the agent to use technology that risked violating the TCPA. That

outcome would undermine the FCC's ruling that the seller is in the best position to "monitor

and police" its third-party telemarketers. *In re Dish*, 28 FCC Rcd. at 6588.

PillPack also focuses on the ten-factor test outlined in *Jones*. But the Ninth Circuit

amended *Jones* to clarify that the test is "limited to the issue before the court," which was

"whether a principal, who has hired third-party telemarketers, exercises sufficient control to

be held vicariously liable under the TCPA to the same degree that an employer may be held

liable for the actions of its employees." 887 F.3d at 451 n.4. The court "express[ed] no opinion

on the usefulness" of the test for other theories of agency. *Id*. The case PillPack cites as

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

applying the *Jones* factors was decided before the Ninth Circuit issued its amended opinion. *See Knapp*, 2018 WL 659016, at *3. Because Plaintiff does not claim that PillPack is liable to the same degree as an employer, the *Jones* multi-factor test is irrelevant.

**B.     A jury could find PillPack liable under an apparent authority theory.**

"Apparent authority arises by 'a person's manifestation that another has authority to act with legal consequences for the person who makes the manifestation, when a third party reasonably believes the actor to be authorized and the belief is traceable to the manifestation.'" *Mavrix*, 873 F.3d at 1055 (quoting Restatement § 3.03). The principal's manifestations may be "direct statements to the third person" or "granting of permission to the agent to perform acts . . . under circumstances which create in [the alleged agent] a reputation of authority." *Id.* (internal citation and quotation marks omitted).

Any person who gets a call describing PillPack's signature service and is transferred directly to a PillPack employee who tries to sell PillPack's services would believe PillPack or someone authorized by PillPack placed the initial call. The PillPack call center employees who "announced" PillPack's identity (Dkt. 82 at 25), are the source of that reasonable belief. And that is what Plaintiff thought, which is why he told PillPack: "I need you to please, ummm, stop calling people with the automated phone call. That is very, very illegal." Dkt. 64 at 40; *see also* Ex. 20 (Williams Dep.) at 40:10-16. Unlike the cases PillPack relies on, PillPack made an affirmative manifestation directly to Plaintiff and all members of the proposed transfer sub-class when its call center employees identified themselves as PillPack.[3]

*Braver* is the case most directly on point. 2019 WL 3208651, at *13. There, the district court addressed a live transfer campaign like PillPack's and found the defendant vicariously liable under an apparent authority theory for calls placed by Yodel—a Prospects affiliate. *Id.* In doing so, the court relied on evidence that the defendant approved the avatar script, the

---

[3] For example, neither *Rogers v. Postmates Inc.*, 2020 WL 1032153, at *4 (N.D. Cal. Mar. 3, 2020), nor *Makaron v. GE Sec. Mfg., Inc.*, 2015 WL 3526253 (C.D. Cal. May 18, 2015) involved calls live transferred by the alleged agent to the alleged principal or statements made by the alleged principal directly to the plaintiff.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

script accurately described the defendant's product, and the defendant accepted the live transfers. *Id.* at *8, 13. The court explained that the defendant demonstrated to the consumers called , by both its conduct toward them, and its conversations with the called persons, that Yodel (using a fictitious name) had the apparent authority to place the initial calls. *Id.* at *13.

The same is true here. From the consumer's perspective, each call was a single transaction. A robot named "John" called the consumer and described a "pharmacy partner" providing PillPack's multi-packing service: "they also pre-sort your daily medications into individual time-of-day packets." Dkt. 37-12. Rather than a general reference to a pharmacy service (Dkt. 82 at 23), this is a PillPack-approved description of multi-packing. Ex. 1 at 121:14-122:17; Ex. 3 at 113: 24-15; Ex. 2 at 66:17-68:13. The robot then said, "I'd like to transfer to you to <u>our</u> pharmacy representative now to tell you more about the service, is that OK?" *Id.* (emphasis added). Then the consumer went directly to a PillPack employee who identified the company by name and tried to sell PillPack's service.

PillPack attempts to downplay the manifestations by its employees that Prospects had authority to make the calls by saying call center agents greeted consumers as they would "any inbound caller." Dkt. 82 at 22. But these consumers were *not* inbound callers. They received a call and were transferred on a phone line that PillPack owned. That is why they responded to "Thank you for calling PillPack, how can I help you today?" with "I don't know, you tell me . . . somebody called me and they then sent me to you," or "I don't know they connected me to you so." Dkt. 30-27 at 3-4.

PillPack cites the Ninth Circuit's unpublished decision in *Taco Bell* and says Plaintiff must show that he "reasonably relied" on PillPack's manifestations giving rise to his belief that Prospects had authority to call. That is wrong. *Taco Bell* relies on Section 265 of the Second Restatement of Agency, which addresses a principal's tort liability, not apparent authority. *See Taco Bell*, 582 F. App'x. at 678; *Lushe v. Verengo Inc.*, 2015 WL 500158, at *5 (C.D. Cal. Feb. 2,

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

2015) (distinguishing *Taco Bell* and finding no substantial ground for difference of opinion on the conclusion that reliance is not necessary to establish apparent authority). The Ninth Circuit uses the Third Restatement of Agency to determine vicariously liability under the TCPA. *Kristensen*, 879 F.3d at 1014. The Third Restatement is clear that reliance is not required. Restatement § 2.03, cmt. e ("To establish that an agent acted with apparent authority, it is not necessary for the plaintiff to establish that the principal's manifestation induced the plaintiff to make a detrimental change in position. . . .").

The district court's analysis in *Kristensen* does not help PillPack either. Those plaintiffs could not point to any statements made directly to them by the alleged principals that caused them to think the alleged agents had authority to send texts. By contrast, Plaintiff points to both the content of the PillPack-approved robocall script and statements PillPack's call center agents made to him. The FCC identified five examples of types of evidence that may be relevant to finding apparent authority. *Kristensen*, 2015 WL 4477425, at *5. PillPack lists four examples (Dkt. 82 at 21-22), but omits the fifth: "that the seller approved, wrote or reviewed the outside entity's telemarketing scripts." *In re Dish*, 28 FCC Rcd. at 6592. It is undisputed that PillPack did just that.

The only case PillPack cites that involves live transfers is *Abante Rooter & Plumbing, Inc. v. Arashi Mahalo LLC*, but there the plaintiff "did not develop the record in any meaningful way" to support his theories of vicarious liability. 2019 WL 6907077, at *1 (N.D. Cal. Dec. 19, 2019). Nonetheless, the court concluded that the transfer would lead a consumer to conclude the caller had authority to procure leads for the alleged principal. *Id.* The court found that the alleged principal did not say anything suggesting the caller had authority to use an ATDS but offered no analysis or support for such a requirement other than the trial court's summary judgment ruling in *Kristensen*, which does not impose such a requirement or deal with live transfers. The *Arashi* court's four-sentence analysis based on limited facts is unpersuasive and should be rejected.

**Terrell Marshall Law Group PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

## C. A jury could find PillPack ratified Performance Media and Prospects' calling activity.

"Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." *Henderson*, 918 F.3d at 1073 (quoting Restatement § 4.01). Ratification "creates consequences of actual authority, including, in some circumstances, creating an agency relationship when none existed before." *Id.* (quoting Restatement § 4.01 cmt. b.). There are two ways to ratify a third party's acts: (1) knowing acceptance of the benefit where there is an objective indication that the principal exercised choice and consented to the acts of the agent; and (2) willful ignorance, where the principal may not know the material facts but ratifies the purported agent's conduct with "awareness that such knowledge was lacking." *Id.* (citing Restatement § 4.01 cmt. d).

A principal may ratify acts done by an agent or a person who purports to be one.[4] Restatement § 4.01 cmt. b. Prospects was or purported to be PillPack's agent when it used a PillPack-approved script to qualify potential leads for transfer directly to PillPack. The contract requires ███████████████████████████████████████████████████████████ ████████████ Dkt. 37-13 (Exhibit A at ¶ 4); Ex. 3 at 116:25-117:9. The script described PillPack's service and asked permission to transfer the consumer. By approving the script, PillPack affirmed that the avatar's questions ████████████████████████████████████ ███████████████████████████ How can a consumer provide such consent unless they are talking to someone acting on PillPack's behalf?

In addition, PillPack's claim that Prospects "never used PillPack's name in lead generation calls" (Dkt. 82 at 25) is false. The script PillPack approved included a warm "handoff" where the avatar said, "I have a qualified candidate on the line who is interested in learning more about PillPack's services. Please help them from here." Dkt. 30-24 at BYTE-SUCCESS_000013. Prospects DM's avatar initially used this warm handoff on the calls. *See,*

---

[4] PillPack quotes *Batzel v. Smith* for the proposition that ratification cannot create an agency relationship where none existed when the act was done, but the Ninth Circuit explained in *Henderson* that *Batzel* "involved vicarious liability and agency principles under California law" and is inconsistent with the Third Restatement of Agency. 918 F.3d at 1074.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

*e.g.*, Ex. 21 at Line 6. PillPack later directed Performance Media to do a "blind" transfer instead because PillPack call center employees were "having difficulty with 'John' and it has become a headache for the client with their complaining." Ex.11. In other words, PillPack's call center agents complained to Hunt about the avatar calls in April 2018, Hunt directed Dorf to change the way the calls were handed off, and Dorf immediately relayed that directive to Grant, who obeyed it. Prospects purported to act as an agent of PillPack when making outbound calls to qualify leads for PillPack and then transferring the leads to PillPack.

If a principal "has knowledge of facts that would have led a reasonable person to investigate further, but the principal ratified without further investigation," the principal has "assumed the risk of liability" and is vicariously liable. *Kristensen*, 879 F.3d at 1014. A reasonable jury could conclude that PillPack had actual knowledge that the calls were placed without the prior express consent required by the TCPA. First, PillPack knew Performance Media was going to be placing calls using prerecorded voice messages and that Performance Media itself was not maintaining documented evidence of prior express consent. PillPack manifested assent to this arrangement by signing a contract stating that Performance Media would "cause its media sources" to maintain evidence of consent. PillPack knew the "creatives" Performance Media used to obtain purported consent did not list either PillPack or Performance Media as a company the consumer was agreeing to receive calls from. Instead, PillPack knew Performance Media was generating the leads under its own fictitious name. Ex. 3 at 96:24-97:13. PillPack knowingly assumed the risk that such consent was legal. Plaintiff's position is that it was not. This issue is not presented by PillPack's motion.

Second, there were numerous "red flags," that should have led PillPack to investigate whether Performance Media or Prospects obtained prior express written consent. Numerous consumers complained to PillPack call center agents, including that they did not want to be transferred to PillPack. None of the cases on which PillPack relies discuss evidence of consumer complaints made directly to the purported principal. *See, e.g., Kristensen*, 2015 WL

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

4477425, at *3 (plaintiff relied on lenders' "general knowledge" of the industry); *Armstrong v. Investor's Business Daily, Inc.*, 2020 WL 2041935 (C.D. Cal. Mar. 6, 2020) (plaintiff relied on a lawsuit against the caller of which alleged principal was unaware). PillPack suggests that complaints cannot raise a red flag unless the consumer says, "you called me in violation of the TCPA." That makes no sense and would encourage sellers to ignore warning signs about calls made without consent. Further, PillPack has not produced complaints stored in its Slack system, or its recordings of calls transferred to its PPAC call center agents by Prospects.

*Cooley v. Freedom Forever, LLC*, 2019 WL 8126847 (D. Nev. Nov. 25, 2019), does not present facts "identical" to those here. *Cooley* was dismissed at the pleading stage so there were no facts before the court at all. The plaintiff did not allege that an agent live transferred a call to the defendant but instead alleged that after getting a call from the principal's agent he got a follow up email from the agent saying the principal might come to his house. *Id.* at *1. Those allegations bear no resemblance to the campaign at issue here.[5]

PillPack says it raised concerns with Dorf about do-not-call requests and complaints and he told PillPack not to worry. But PillPack did not question Dorf's assurance even though PillPack wasn't "expecting any other response" because people in marketing don't admit problems with their leads. Ex. 1 at 65:1-67:3. PillPack didn't investigate whether Performance Media had consent to call the consumers making DNC requests; although she managed the campaigns, Ranneberg did not consider that to be her responsibility. *Id.* at 155:16-158:20.

PillPack continued to accept Performance Media's leads for an additional two months after Plaintiff filed this lawsuit. It did so despite knowing that Performance Media was the source of the call to Plaintiff and that the only proof of purported consent Performance Media or Prospects could supply was an "opt-in" in the name of Michael Morgan. And when Ranneberg called Dorf about this lawsuit, she did not ask whether he called Plaintiff, what

---

[5] *Cooley* was dismissed without prejudice and a subsequent motion to dismiss based on vicarious liability was denied. *Cooley v. v. Freedom Forever LLC,* 2020 WL 1027149, at *3 (D. Nev. Feb. 13, 2020).

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

voice technology was used, or to provide documented evidence that Plaintiff consented to be called. *Id.* at 124:8-128:23. And when PillPack finally terminated the relationship with Performance Media, it did so not because of any concern about TCPA violations, but because PillPack wanted to change its marketing strategy to "generate new customers at a lower cost per acquisition." *Id.* at 164:16-22; Ex. 3 at 37:1-4.

PillPack wrongly maintains that there is no evidence that it benefitted from the unlawful calls because Plaintiff did not purchase PillPack's services. Dkt. 82 at 28–29. Numerous courts have rejected this argument. *Abante Rooter & Plumbing, Inc. v. Alarm.com,* 2018 WL 3707283, at *5 (N.D. Cal. Aug. 3, 2018) (finding ratification a question for the jury where Alarm.com accepted thousands of dollars in sales despite being aware of concerns about the practices of entity placing the calls). In *Aranda*, the court found a triable issue of fact even though the named plaintiffs did not purchase anything where the evidence showed the defendants were aware of unlawful telemarketing calls but "continued to accept business flowing" from those calls. 179 F. Supp. 3d at 833. PillPack also continued to accept the "steady stream of leads" that Performance Media generated, and the thousands of consumer sign ups from those leads, despite consumers' complaints.

A reasonable jury could conclude that PillPack ratified Performance Media's calling campaign by continuing to use the leads to generate sales despite knowing about problems with the calls. Alternatively, the Court should permit additional discovery into ratification. Fed. R. Civ. P. 56(d)(1). Complaints were shared among PillPack employees via Slack and would be reflected in call recordings. PillPack has not produced Slack messages or recordings despite Plaintiff's repeated requests. Murray Decl. ¶ 24.

## V. CONCLUSION

Plaintiff requests that the Court deny PillPack's motion for summary judgment (Dkt. 82). The voluminous record of common evidence reveals that Plaintiff and the proposed class and subclass are likely to prevail on the determinative issue of vicarious liability.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

RESPECTFULLY SUBMITTED AND DATED this 21st day of September, 2020.

TERRELL MARSHALL LAW GROUP PLLC

By: /s/ Jennifer Rust Murray, WSBA #36983
Beth E. Terrell, WSBA #26759
Email: bterrell@terrellmarshall.com
Jennifer Rust Murray, WSBA #36983
Email: jmurray@terrellmarshall.com
Adrienne D. McEntee, WSBA #34061
Email: amcentee@terrellmarshall.com
Blythe H. Chandler, WSBA #43387
Email: bchandler@terrellmarshall.com
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
Telephone: (206) 816-6603

Walter M. Smith, WSBA #46695
Email: walter@smithdietrich.com
Steve E. Dietrich, WSBA #21897
Email: steved@smithdietrich.com
SMITH & DIETRICH LAW OFFICES PLLC
3905 Martin Way East, Suite F
Olympia, Washington 98506
Telephone: (360) 918-7230

Anthony I. Paronich, *Admitted Pro Hac Vice*
Email: anthony@paronichlaw.com
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, Massachusetts 02043
Telephone: (617) 485-0018
Facsimile: (508) 318-8100

*Attorneys for Plaintiff and the Proposed Class*

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

## CERTIFICATE OF SERVICE

I, Jennifer Rust Murray, hereby certify that on September 21, 2020, I electronically filed

the foregoing with the Clerk of the Court using the CM/ECF system which will send notification

of such filing to the following:

> Kenneth E. Payson, WSBA #26369
> Email: kenpayson@dwt.com
> Lauren B. Rainwater, WSBA #43625
> Email: laurenrainwater@dwt.com
> Sara A. Fairchild, WSBA #54419
> Email: sarafairchild@dwt.com
> MaryAnn T. Almeida, WSBA #49086
> Email: maryannalmeida@dwt.com
> DAVIS WRIGHT TREMAINE LLP
> 920 Fifth Avenue, Suite 3300
> Seattle, Washington 98104-1610
> Telephone: (206) 622-3150
> Facsimile: (206) 757-7700
>
> *Attorneys for Defendant*

DATED this 21st day of September, 2020.

> TERRELL MARSHALL LAW GROUP PLLC
>
> By:   /s/ Jennifer Rust Murray, WSBA #36983
> Jennifer Rust Murray, WSBA #36983
> Email: jmurray@terrellmarshall.com
> 936 North 34th Street, Suite 300
> Seattle, Washington 98103
> Telephone: (206) 816-6603
> Facsimile: (206) 319-5450
>
> *Attorneys for Plaintiff and the Proposed Class*

PLAINTIFF'S RESPONSE TO DEFENDANT PILLPACK'S MOTION
FOR SUMMARY JUDGMENT - 26
CASE NO. 3:19-CV-05282-TSZ

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com