THE HONORABLE DAVID G. ESTUDILLO

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

AARON WILLIAMS, on behalf of himself and all
others similarly situated,

                                 Plaintiff,

        vs.

PILLPACK LLC,

                                 Defendant.

Case No. 3:19-cv-05282-DGE

**PLAINTIFF'S RESPONSE TO
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT**

**ORAL ARGUMENT REQUESTED**

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT
Case No. 3:19-cv-05282-DGE

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ......................................................................... 1

II.   STATEMENT OF FACTS............................................................. 2

      A.   PillPack relied on aggressive telemarketing to generate customers................. 2

      B.   PillPack's form contract gave it the ability to control the calling campaign...... 2

      C.   Performance Media did not run a "generic pharmacy campaign"—
           Performance Media ran PillPack's campaign as PillPack directed ................... 3

           1.   PillPack controlled the timing and number of calls.............................. 6

           2.   PillPack approved Performance Media's use of an avatar to
                make the calls ........................................................................ 6

           3.   PillPack approved the avatar script and its description of
                PillPack's service ................................................................... 7

      D.   PillPack failed to investigate complaints, instead accepting hundreds
           of leads daily........................................................................... 7

           1.   Consumers complained to PillPack repeatedly about the
                prerecorded calls ..................................................................... 7

           2.   PillPack did little or nothing to investigate complaints
                about the calls ........................................................................ 8

           3.   PillPack converted thousands of Performance Media's live transfers
                to subscribers ......................................................................... 9

III.  ARGUMENT AND AUTHORITY ................................................... 10

      A.   Vicarious liability standards under the TCPA ................................ 10

      B.   PillPack mischaracterizes *Kristensen v. Credit Payment Services* ................... 11

      C.   A reasonable jury could find Performance Media had actual
           authority to run the PillPack campaign with third party calling vendors ........ 12

           1.   A reasonable jury could find that Performance Media was
                PillPack's agent ..................................................................... 12

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

2.  A reasonable jury could find Performance Media's vendors
    were PillPack's subagents ........................................................ 14

3.  A reasonable jury could find Performance Media had implied
    actual authority to run the PillPack campaign through third
    party calling vendors........................................................... 15

4.  *Jones* does not preclude a finding of actual authority on
    these facts .......................................................................... 17

D.  A reasonable jury could find that Performance Media's subagents had
    apparent authority to place the calls................................................. 19

E.  A reasonable jury could find that PillPack ratified the conduct
    of Performance Media's call center vendors by accepting the
    enefits of the transferred calls despite red flags ............................................. 21

IV.  CONCLUSION ...................................................................... 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

**TABLE OF AUTHORITIES**

Page

*Abante Rooter & Plumbing, Inc. v. Alarm.com*,
2018 WL 3707283 (N.D. Cal. Aug. 3, 2018) ........................................................ 10, 24

*Abante Rooter & Plumbing, Inc. v. Arashi Mahalo LLC*,
2019 WL 6907077 (N.D. Cal. Dec. 19, 2019) .............................................. 20

*Aranda v. Caribbean Cruise Line, Inc.*,
179 F. Supp. 3d 817, 832 (N.D. Ill. 2016) ........................................14, 15, 24

*Armstrong v. Investor's Business Daily, Inc.*,
2020 WL 2041935 (C.D. Cal. Mar. 6, 2020) ................................................ 22

*Batzel v. Smith*,
333 F.3d 1018 (9th Cir. 2003) .................................................................... 21

*Braver v. NorthStar Alarm Servs., LLC*,
2019 WL 3208651 (W.D. Okla. July 16, 2019).................................13, 18, 19

*Desai v. ADT Sec. Sys., Inc.*,
78 F. Supp. 3d 896 (N.D. Ill. 2015) ............................................................ 14

*Henderson v. United Student Aid Funds, Inc.*,
918 F.3d 1068 (9th Cir. 2019) ........................................................... *passim*

*Johnson v. Comodo Grp., Inc.*,
2020 WL 525898 (D.N.J. Jan. 31, 2020) .................................................... 18

*Jones v. Royal Administration Services, Inc.*,
887 F.3d 443 (9th Cir. 2018) ............................................................... 17, 18

*Knapp v. Sage Payment Solutions, Inc.*,
2018 WL 659016 (N.D. Cal. Feb. 1, 2018) ................................................. 19

*Krakauer v. Dish Network L.L.C.*,
No. 1:14-cv-00333-CCE-JEP (N.D. W.Va. Jan. 19, 2017)............................. 15

*Kristensen v. Credit Payment Services Inc.*,
2015 WL 4477425 (D. Nev. July 20, 2015) ......................................... *passim*

*Kristensen v. Credit Payment Servs.*,
879 F.3d 1010 (9th Cir. 2018) ........................................................... *passim*

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

*Lushe v. Verengo Inc.*,
    2014 WL 5794627 (C.D. Cal. Oct. 22, 2014) ........................................................ 13, 15

*Makaron v. GE Sec. Mfg., Inc.*,
    2015 WL 3526253 (C.D. Cal. May 18, 2015) ................................................................ 19

*Mavrix Photographs, LLC v. LiveJournal, Inc.*,
    873 F.3d 1045 (9th Cir. 2017) .............................................................................. 12, 19

*Meeks v. Buffalo Wild Wings, Inc.*,
    2018 WL 1524067 (N.D. Cal. Mar. 28, 2018) .............................................................. 17

*Naiman v. Blue Raven Solar, LLC*,
    2021 WL 4395049 (D. Nev. Sept. 24, 2021) ................................................................ 18

*Rogers v. Postmates Inc.*,
    2020 WL 1032153 (N.D. Cal. Mar. 3, 2020) ................................................................ 19

*R&R adopted by Grant v. Regal Auto. Grp.*,
    2020 WL 8224838 (M.D. Fla. Sept. 29, 2020) ............................................................ 14

*Salyers v. Met. Life Ins. Co.*,
    871 F.3d 934 (9th Cir. 2017) ...................................................................................... 15

*Schick v. Caliber Home Loans, Inc.*,
    2021 WL 4166906 (N.D. Cal. Sept. 12, 2021) ........................................................ 15, 23

*Soma Surgery Center, Inc. v. Aetna Life Ins. Co.*,
    2018 WL 1989442 (C.D. Cal. April 11, 2018) .............................................................. 14

*Thomas v. Taco Bell Corp*,
    879 F. Supp. 2d 1079 (C.D. Cal. 2012),
    *aff'd*, 879 F. App'x 678 (9th Cir. 2014) ...................................................................... 16

**FEDERAL RULES**

Fed. R. Civ. P. 56(a) .......................................................................................................... 10

**OTHER AUTHORITIES**

Restatement (Third) of Agency § 1.01 .............................................................................. 12

Restatement (Third) of Agency 2.02 ................................................................................ 15

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - ii
Case No. 3:19-cv-05282-DGE

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Restatement (Third) of Agency 3.03 ...................................................................... 19

Restatement (Third) of Agency § 3.15................................................................... 14

Restatement (Third) of Agency 4.01 ...................................................................... 21

*FTC Advisory Opinion/Comment Letter on Soundboard Technology,*
    2016 WL 4795392 (F.T.C. Nov. 10, 2016) ................................................... 18

*In re Joint Petition filed by Dish Network, LLC,*
    28 FCC Rcd. 6574 (2013)........................................................................ 10, 18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1

### I.   INTRODUCTION

2      PillPack sought summary judgment on vicarious liability when this case was before

3   Judge Zilly. The Court denied PillPack's motion finding genuine issues of material fact about

4   whether PillPack is liable for the calls made to Plaintiff Aaron Williams' and the proposed class

5   members' cellphones. (Dkt. No. 126.) The evidence shows that the PillPack Performance Media

6   campaign was designed so that Performance Media and its vendors first called consumers using

7   a prerecorded voice that read a script approved by PillPack. Performance Media's vendors then

8   transferred thousands of calls to PillPack on a telephone line PillPack created and maintained

9   for the campaign. Then PillPack's call center employees tried to sell PillPack's multipacking

10   service, but also received complaints from consumers about the prerecorded voice calls.

11      That is the evidence the Court relied on in finding genuine issues of material fact

12   regarding vicarious liability. PillPack claims it has new evidence—the testimony of Josh Grant

13   that Prospects DM did not place all of the calls at issue but instead directed its call center

14   vendors to place the calls—that drives a different outcome on this motion than on its first

15   motion making nearly identical arguments. PillPack's argument fails because Rule 56 requires

16   the Court to construe all evidence in the light most favorable to Williams. The Court cannot

17   accept PillPack's characterization of Grant's testimony over the evidence showing that PillPack

18   hired Performance Media to run a calling campaign without obtaining consent from consumers

19   to receive calls selling PillPack's services.

20      The live transfer nature of the campaign that PillPack hired Performance Media to run

21   distinguishes it from many of the cases on which PillPack relies. Williams has presented

22   evidence from which a reasonable jury could find PillPack vicariously liable for the calling

23   campaign it designed, controlled, and profited from under classical agency, apparent authority,

24   or ratification theories. Williams respectfully requests that the Court deny PillPack's second

25   motion for summary judgment on vicarious liability (Dkt. No. 252).

26

27

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

## II.    STATEMENT OF FACTS

**A.    PillPack relied on aggressive telemarketing to generate customers.**

PillPack provides a distinctive pharmacy service called multipacking. (Dkt. No. 229-1 at 21:17-20.) PillPack "packages multiple pills into one square, plastic sleeve" that is labeled with the day and time the consumer should take them. (*Id.* at 21:24-22:7.) Multipacking distinguishes PillPack from other pharmacies. (*Id.* at 21:20-22, 22:8-13; Dkt. No. 229-2 at 66:7-68:9 (PillPack approved marketing partner scripts to ensure consistent messaging about PillPack's multipacking service).)

Telemarketing fueled PillPack's success. Telemarketing partners generated "inbound" call transfers that led to over ▮▮▮ customer sign ups during a single four-week period. (Dkt. No. 234-3; Dkt. No. 229-1 at 182:4-184:18.) In four weeks, Performance Media delivered ▮▮▮ calls to PillPack, resulting in 800 sign ups. (Dkt. No. 234-3.) PillPack paid Performance Media between $▮▮▮ and $▮▮▮ per month for live transfer leads. (*See, e.g.*, Dkt. No. 234-2 (reflecting weekly spend on "PER MEDIA" campaign).)

**B.    PillPack's form contract gave it the ability to control the calling campaign.**

PillPack's Chief Business Officer signed the contract with Performance Media authorizing the campaign. (Dkt. No. 229-26 ("contract").) The contract is a form agreement drafted by PillPack. It defines what constitutes a qualified lead for which PillPack would pay Performance Media. (*Id.* (Exhibit A ¶ 4).) To be qualified, a lead must "have provided clear and affirmative consent to be transferred to or contacted by PillPack." (*Id.*; *see also* Dkt. No. 98-3 at 116:25-117:9.) The contract requires Performance Media to transfer leads to PillPack "on a real-time basis through such data transfer platform(s) as directed by PillPack." (Dkt. No. 229-26 (Exhibit A ¶ 3).) Under the contract, "All scripts and messaging used in connection with any Campaign shall be approved by PillPack in advance." (*Id.* (Exhibit A ¶ 1).) The contract limited the times when Performance Media could provide live transfer leads to PillPack to "PillPack's then-current business hours as provided by PillPack from time to time." (*Id.* (Exhibit A ¶ 4, bullet 4, sub-bullet 2).)

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1   The contract acknowledges repeatedly that Performance Media may use vendors,

2   agents, or subcontractors on the campaign. It says "Provider *and all of its employees, agents,*

3   *and contractors*" will comply with applicable laws. (*Id.* (Terms and Conditions ¶ 4(d)).) PillPack

4   allowed Performance Media to water down a form provision that would have required

5   Performance Media to maintain documented evidence of TCPA consent to a requirement that

6   Performance Media merely "cause its media sources" to maintain such evidence. (*Compare* Dkt.

7   No. 229-29 at PP_000872 (redline revision proposed by Dorf) *with* Dkt. No. 229-26 (Terms and

8   Conditions ¶ 4(g) (executed contract including Dorf's revision)).)

9   The contract also gives PillPack the right to audit the consent Performance Media

10  obtained before making prerecorded calls. (*Id.* (Terms and Conditions ¶ 4(g)).) PillPack

11  permitted Dorf to delete a provision requiring Performance Media to "employ an end user opt

12  in verification service selected by PillPack." (*Compare* Dkt. No. 229-29 at PP_000869 *with* Dkt.

13  No. 229-26 (Exhibit A ¶ 1).) Although PillPack generally required such verifications—called

14  "trusted forms"—to ensure that valid TCPA consent was obtained for calls selling PillPack

15  services, (Dkt. No. 98-3 at 203:7-11), PillPack did not impose the verification requirement on

16  Performance Media because Performance Media was dialing "under their own DBA." (*Id.* at

17  204:18-24.) PillPack knew the websites Performance Media used to obtain purported consent

18  did not list PillPack as a company the consumer would receive calls from. (*Id.* at 97:8-13.)

19  Although the contract characterizes Performance Media as "an independent contractor"

20  it also contemplates that Performance Media will provide live transfer calling campaign services

21  "under PillPack's general direction" and "in accordance with the terms of this Agreement." (Dkt.

22  No. 229-26 (Terms and Conditions ¶ 8(a)).)

23  **C.   Performance Media did not run a "generic pharmacy campaign"—Performance Media**
24  **ran PillPack's campaign as PillPack directed.**

25  PillPack hired Performance Media to make outbound calls that would generate leads for

26  PillPack. The intent was for "Performance Media to be calling and transferring those calls into

27  PillPack as an inbound transfer." (Dkt. No. 229-5 at 98:8-10, 98:24-99:2, 100:9-14.) Tyler Hunt,

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 3
Case No. 3:19-cv-05282-DGE

1  PillPack's Growth and Acquisitions Manager, set up the Performance Media campaign with the

2  help of Mark Dorf of Performance Media and Christie Anderson, a consultant from Byte

3  Success. (Dkt. No. 229-6 (confirming next steps on campaign); Dkt. No. 229-5 at 25:15-27:2.)

4       Despite that, PillPack's motion repeatedly characterizes the campaign as a "generic"

5  pharmacy campaign based on Josh Grant's testimony. Mot. at 3-4. But PillPack's

6  characterization of Grant's testimony draws inferences in PillPack's favor, many of which are

7  not supported by the testimony. For example, Mr. Grant said he referred to the campaign as

8  the "Performance Media pharmacy campaign," (Ex. 1[1] at 147:9-13), but he acknowledged that

9  Dorf always called it the "PillPack" campaign, (*id.* at 150:17-24) (everybody, *including Mark*

10 *Dorf*, called it the PillPack campaign).

11      Email communications between Dorf and Grant confirm that Dorf routinely provided

12 Grant with directions for the "PillPack" campaign, not a generic pharmacy campaign:

13      • In March 2018 Dorf sent Grant an email with the subject "Pillpack TFN"

14        providing the 866-298-0058 transfer number created by PillPack for the

15        campaign. Dorf described it as the transfer number "to use for the Pillpack

16        campaign." (Dkt. No. 250-4.)

17      • In April 2018, Dorf and Grant exchanged emails with the subject line "Pillpack

18        Campaign." Dorf relayed to Grant that PillPack call center agents are

19        complaining about "John" the prerecorded voice on the calls. (Dkt. No. 250-3.)

20      • In December 2019, Dorf and Grant had a lengthy email exchange with the

21        subject line "PILLPACK." (Ex. 2.) The exchange reflects coordination of calling

22        hours based on PillPack's schedule and that Prospects and its vendors could not

23        change hours for the campaign without PillPack's consent.

24      • In November 2018, Dorf emailed Grant with the subject "Pillpack Call Volume

25        Increase" to advise him that PillPack increased its daily call allocation. Grant

26

27 [1] Exhibits not already in the record are attached to the Declaration of Jennifer Rust Murray in
   support of Plaintiff's opposition to PillPack's motion for summary judgment.

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 4
Case No. 3:19-cv-05282-DGE

1    responded that he will "get agents added today and tomorrow" to increase call

2    volume. (Dkt. No. 98-12.)

3        At trial, Mr. Williams will use these emails and other testimony to challenge the

4    credibility of Grant's claim that the calling campaign PillPack commissioned was a "generic"

5    pharmacy campaign. (*See, e.g.*, Ex. 2 at PerformanceMedia_000223 (Grant writes to Dorf that

6    he is "monitoring the PillPack campaign closely this week")).)

7        PillPack tells the Court that PillPack was added to Performance Media's pre-existing

8    pharmacy calling campaign. (Mot. at 4:2, 3:10-12.) That too is disputed. PillPack points to

9    Grant's testimony that he ran a pharmacy campaign for Dorf and that he believed Dorf had

10   another pharmacy client. (Ex. 1 at 146:14-148:22.) But Grant did not testify that there was any

11   pharmacy campaign running *before* PillPack hired Performance Media. PillPack also points to its

12   expert's finding that Grant produced some call records that predate PillPack's campaign with

13   Performance Media. (Mot. at 3 (citing Dkt. No. 61, Ex. 16 ¶ 64).) But that may simply mean

14   Grant's subpoena response was overbroad. PillPack ignores the emails showing that Grant and

15   Dorf set up the campaign as a "PillPack" campaign. For example, in February 2018 Dorf sent

16   Grant an email with the subject line "PillPack" and provided "ad copy and pre-qual script for

17   Pillpack to use for crafting script." (Dkt. No. 98-8.) Hunt testified that he and Anderson wrote

18   that script and provided it to Dorf to use in drafting a script for the campaign. (Ex. 3 at 105:2-

19   106:14.) And the call script mirrors the language Hunt wrote. (Dkt. No. 229-22.)

20       PillPack says Prospects contracted with call centers "[w]ithout Performance Media's

21   knowledge, much less PillPack's." (Mot. at 4:16-18.) That too is disputed. None of the testimony

22   PillPack cites discusses either Performance Media's or PillPack's knowledge about any subagent

23   call center Grant may have used. And PillPack's contract with Performance Media specifically

24   contemplated use of vendors or subagents, as discussed above. Dorf told PillPack "the options

25   of how we work with [Prospects DM's] offshore and onshore" call centers. (Dkt. No. 98-8.)

26   PillPack directed Performance Media to use Prospects' "offshore only" vendor "to keep the cost

27   down." (Dkt. No. 98-8.) Moreover, Hunt testified that he knew the DBA that Performance

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 5
Case No. 3:19-cv-05282-DGE

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  Media was calling under was Helping Hands Network. (Ex. 3 at 107:18-25.) Helping Hands

2  Association is a DBA of Yodel, the call center subagent that PillPack claims it didn't know about.

3  (Ex. 4 at 143:23-144:1 (Yodel used Helping Hands Association DBA to place calls for PillPack

4  campaign).) There is a genuine issue of material fact about whether Hunt knew Yodel was

5  placing the calls.

6        1.    <u>PillPack controlled the timing and number of calls.</u>

7        PillPack and Performance Media coordinated on the live transfer lead generation

8  campaign. For example, PillPack owned and operated the number Prospects used to transfer

9  calls to PillPack's call center. (Dkt. No. 63 (Hunt Decl. ¶ 2).) The call center could only make

10  outbound calls and transfers during hours the PPAC call center was staffed to accept the calls

11  and PillPack controlled the timing and volume of calls. (Dkt. No. 229-27 (Hunt directing Dorf to

12  send set number of calls to PillPack call centers); Dkt. No. 98-13 (Ranneberg email directing Dorf

13  to "pull back on overall volume by around 20%"); Dkt. No. 98-14 (Ranneberg email directing

14  Dorf to "drive about ▇ more leads on Saturdays, between 8AM and 2PM MT"); Dkt. No. 98-15

15  (PillPack marketing employee directing lead generation partners not to deliver leads on

16  Memorial Day because "PPAC will likely be closed").) To respond to PillPack's call volume

17  directives, Dorf would "[i]ncrease his outbound calling volume or his numbers or adjust his

18  outbound calling volume to generate [the] number of transfers." (Dkt. No. 229-7 at 72:15-24.)

19        2.    <u>PillPack approved Performance Media's use of an avatar to make the calls.</u>

20        PillPack hired Performance Media to make outbound calls using an "avatar" to play

21  prerecorded voice messages. (Dkt. No. 229-5 at 70:25-71:12, 148:8-10 (PillPack knew

22  Performance Media used "voice recordings"); Dkt. No. 229-9 at 90:1-91:3 (PillPack hired

23  Performance Media to make prerecorded voice calls and transfer qualified leads to PillPack).)

24  Tyler Hunt set up the transfer number for the Performance Media campaign as an "IVR"

25  campaign. (Dkt. No. 229-18.) Every call recording he can recall receiving from Performance

26  Media was a prerecorded voice call as PillPack ordered. (Ex. 3 at 79:18-81:19.) Hunt confirmed

27  that PillPack's documents show the Performance Media campaign calls were placed using "a

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  call recording. It was a recorded set of questions and answers." (*Id.* at 58:23-59:23.) No one at

2  PillPack disagreed that recordings of the prerecorded voice calls Dorf provided were "exactly as

3  ordered" by PillPack. (Dkt. No. 229-25.)

4        3.    <u>PillPack approved the avatar script and its description of PillPack's service.</u>

5        PillPack exercised its authority under the contract to approve scripts and messaging in

6  advance. (Dkt. No. 98-2 at 112:1-113:18; Dkt. No. 229-5 at 113:24-15 ("Tyler Hunt approved the

7  script with Performance Media"), 153:16-25; Dkt. No. 229-21 at BYTE-SUCCESS_000011 ("This

8  script has been approved by Tyler."); Ex. 3 at 76:4-20 (Dorf provided recordings and Hunt

9  "listen[ed] to how calls progressed through based upon the scripts that we ultimately

10  established between each other").) PillPack had standard language that it required partners to

11  use to communicate "what PillPack is" and its distinctive multi-packing service. (Dkt. No. 98-2 at

12  66:17-68:13.) PillPack expected Performance Media to use the approved script. (Dkt. No. 98-2

13  at 109:25-110:21.) And the script conveyed PillPack's messaging on its multi-packing service.

14  (*Id*. at 108:13-109:3; Dkt. No. 229-1 at 122:4-17.)

15  **D.    PillPack failed to investigate complaints, instead accepting hundreds of leads daily.**

16        1.    <u>Consumers complained to PillPack repeatedly about the prerecorded calls.</u>

17        PillPack received numerous consumer complaints about the campaign's live-transferred

18  calls. (Dkt. No. 229-1 at 54:3-56:19.) PillPack maintained a "Bad Transfer List" that PPAC call

19  center agents used to record problems with partner leads. (Dkt. No. 98-3 at 17:17-19.) When

20  Mr. Williams was transferred to PillPack the first time (months before this suit was filed), he

21  told PillPack that the prerecorded voice call he received was "very, very illegal and you can be

22  sued." (Dkt. No. 64 at 40.) That complaint was not recorded in any of PillPack's systems. PillPack

23  created the Bad Transfer List in October 2018—it did not document complaints about live

24  transfer calls before that. (Dkt. No.98-1 at 167:24-168:25.)

25        The Bad Transfer List contains 5,466 calls designated "bad transfers" between October

26  2018 and July 30, 2019. (Dkt. No. 98 at ¶ 25.) Ranneberg thought PillPack could not tie

27  complaints on the Bad Transfer List to a particular vendor. But PillPack's Five9 system recorded

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

the numbers transferred on each lead generation partner's DNIS and the timestamp. (Dkt. No. 98-1 at 169:18-171:13.) Ranneberg never asked anyone to match the numbers on the Bad Transfer List to the numbers transferred on the DNIS PillPack set up for Performance Media. (*Id.*) Plaintiff's counsel's paralegal was able to do this in fifteen minutes. (Dkt. No. 98 ¶ 26.) PPAC agents coded hundreds of calls transferred on the Performance Media DNIS as "customer didn't want to be transferred." (*Id.*) Examples of the complaints PPAC agents recorded from consumers transferred by Prospects on the Performance Media DNIS include:

- "apparently the IVR keeps calling and transferring her to us even though shes [sic] told us a few times isnt [sic] interested" (Dkt. No. 98-17 at line 291.)
- "how do you tell a robot I already talked to pillpack and can't use there [sic] service?" (Dkt. No. 98-17 at line 2535.)
- "STATED HE DOES NOT WANT TO GO WITH OUR SERVICE DUE TO US BEING PARTNERED WITH "JOHN" THE ROBOT." (Dkt. No. 98-17 at line 3586.)

During an 18-day period in March 2019, PillPack received at least 343 do-not-call requests from customers live transferred by Performance Media. (Dkt. No. 98-1 at 104:10-15.)

Consumers understood that PillPack had called them. PillPack admits that after a consumer was transferred, its call center employees "announced its identity." (Dkt. No. 82 at 25:16-17.) When PillPack call center agents asked "how can I help you?" consumers responded, "I don't know, you tell me . . . somebody called me and they then sent me to you" or "I don't know they connected me to you so." (Dkt. No. 30-27 at 3-4.)

2.   <u>PillPack did little or nothing to investigate complaints about the calls.</u>

PillPack's Rule 30(b)(6) designee could not identify any investigation or due diligence PillPack did to confirm that Performance Media obtained consent before calling consumers using an avatar. (Dkt. No. 229-5 at 90:1-15.) PillPack did not audit Performance Media. (*Id*. at 54:11-23.) After PillPack received a large volume of do-not-call requests from leads transferred by Prospects, Ranneberg raised the issue with Dorf, but "did not do any investigation" into whether Dorf had consent to call those consumers. (Dkt. No. 98-1 at 155:16-158:20.) She did

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

not consider that to be her responsibility. (*Id.* at 155:22-156:5.) Even after Williams filed this

lawsuit, PillPack did not ask Dorf whether Performance Media called Williams, what voice

technology was used on the call, or for evidence that Williams consented in writing to the calls.

(*Id.* at 124:8-128:23.)

PillPack asked Performance Media about consumer complaints about robocalls.

Ranneberg accepted Dorf's assurance that the problem wasn't on his end, even though she

didn't expect to Dorf to admit to any problem with the leads he sold. (*Id.* at 63:23-67:3.)

Hunt knew about complaints. (Dkt. No. 30-23 at 157:20-158:2 (PPAC call center agents

complained directly to Hunt).) But he only expected PPAC call center agents to put complaining

consumers on PillPack's do not call list, despite knowing that would not stop the Performance

Media calls. Hunt testified that he would not have contacted Dorf about complaints from

consumers that they were being called despite being listed on the national Do Not Call Registry.

(Ex. 3 at 94:7-95:25.)

      3.    <u>PillPack converted thousands of Performance Media's live transfers to subscribers.</u>

The Performance Media PillPack campaign generated a "consistent stream of leads,"

many of whom became customers. (Dkt. No. 229-1 at 147:6-12.) PillPack carefully tracked the

number of subscribers signed up from leads transferred by Performance Media and was

concerned when conversion rates dropped because Performance Media "represented 35%" of

PillPack's inbound leads each month. (Dkt. No. 98-18.) PillPack sold its service to more than

5,600 people transferred to it by Performance Media from September 2018 through June 2019.

(Dkt. No. 234-3.) When PillPack finally ended its relationship with Performance Media, it did so

not because of complaints about TCPA violations, but because PillPack wanted to change its

strategy to "generate new customers at a lower cost per acquisition." (Dkt. No. 98-1 at 164:16-

22; Dkt. No. 98-3 at 37:1-4.)

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

### III.     ARGUMENT AND AUTHORITY

Only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" should a court grant a motion for summary judgment. Fed. R. Civ. P. 56(a). The court views the facts "as a whole and in the light most favorable to the party opposing the motion." *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1071 (9th Cir. 2019). Whether an agency relationship exists requires consideration of "the facts of the relationship" rather than how the parties define it. *Id.* at 1073. There are genuine issues of material fact about whether PillPack is vicariously liable for the calls—as the Court found when it denied PillPack's first motion. (Dkt. No. 126.)

**A.     Vicarious liability standards under the TCPA.**

The FCC's 2013 ruling in *Dish Network* governs vicarious liability under the TCPA. *Kristensen v. Credit Payment Servs.*, 879 F.3d 1010, 1014 (9th Cir. 2018). In *Dish*, the FCC explained that companies that can stop TCPA violations but fail to do so may be vicariously liable for those violations because "the seller is in the best position to monitor and police TCPA compliance by third-party telemarketers[.]" *In re Joint Petition filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6588 (2013). Seller liability "give[s] the seller appropriate incentives to ensure that their telemarketers comply with [the FCC's] rules." *Id.* Allowing a seller "to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties," would leave consumers "in many cases without an effective remedy for telemarketing intrusions" particularly "if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case." *Id.*

Companies may be held vicariously liable for TCPA violations under common law agency principles set out in the Restatement (Third) of Agency, including (1) "classical" agency; (2) apparent authority; and (3) ratification. *Id*. at 6586-87. The Court should deny summary judgment, if it finds genuine issues of fact that are material to any of the theories. *See Abante Rooter & Plumbing, Inc. v. Alarm.com*, 2018 WL 3707283, at *4-5 (N.D. Cal. Aug. 3, 2018) (denying motion for summary judgment where consumer put forward evidence supporting

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    multiple theories of vicarious liability for calls). Here, a jury could find PillPack liable on all three.

2    **B.      PillPack mischaracterizes *Kristensen v. Credit Payment Services*.**

3    In *Kristensen*, the Ninth Circuit did not consider "various theories of vicarious liability"

4    under the TCPA. (Mot. at 10.) Instead, the court's analysis was limited to the only theory the

5    plaintiff argued on appeal—ratification. 879 F.3d at 1012 ("Kristensen claims that [defendants]

6    had ratified the unlawful text messages"). Mr. Kristensen "argues only that there was a genuine

7    issue of material fact as to whether the defendants ratified" the allegedly illegal texts. *Id.* at

8    1013. *Kristensen* does not address either actual or apparent authority.

9    *Kristensen* involved text messages containing a web link. *Id.* at 1013. Consumers who

10   clicked the link *and completed an online application* were directed to the website of one of the

11   lenders *Kristensen* sought to hold accountable for the texts. *Id.* There was "no evidence that the

12   lenders "approved, wrote, or reviewed the texts." *Kristensen v. Credit Payment Services Inc.*,

13   2015 WL 4477425, at *6 (D. Nev. July 20, 2015). The texts were sent as an "indirect result" of

14   the lenders' agreement to buy leads. *Kristensen*, 879 F.3d at 1012. In contrast, PillPack

15   contracted for live transferred phone calls. PillPack wrote and provided a model script that

16   Grant used to write the script for the campaign. And PillPack supplied Performance Media and

17   its vendors with access to its systems by creating a dedicated DNIS telephone line to receive the

18   transfers.

19   Vicarious liability is a fact specific inquiry the requires consideration of the contract and

20   actual course of conduct between alleged principles and agents. *Henderson*, 918 F.3d at 1073.

21   PillPack's claim that *Kristensen* stands for the proposition that there is no vicarious liability for

22   calls placed by agents or subagents when there is "separation" between the named defendant

23   and a call center vendor (Mot. at 12), oversimplifies the analysis. What matters is not whether

24   it was Performance Media or a subcontractor who placed the calls, but PillPack's control

25   through Performance Media over the campaign messaging, the time calls were placed, and the

26   call volume. What matters for ratification is whether PillPack ignored red flags that put it on

27   notice of potential violations and continued to accept the live transfers anyway. PillPack does

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 11
Case No. 3:19-cv-05282-DGE

1  little more than count the number of entities involved in *Kristensen* and the number involved

2  here and concludes that *Kristensen* governs without any consideration of the nature of the

3  relationships between the entities. *Kristensen* does not govern the outcome of this case.

4  **C.    A reasonable jury could find Performance Media had actual authority to run the**
5  **      PillPack campaign with third party calling vendors.**

6       Classical agency first requires a finding of an agency relationship. "Agency is the

7  fiduciary relationship that arises when one person (a 'principal') manifests assent to another

8  person (an 'agent') that the agent shall act on the principal's behalf and subject to the

9  principal's control, and the agent manifests assent or otherwise consents so to act." *Mavrix*

10  *Photographs, LLC v. LiveJournal, Inc.*, 873 F.3d 1045, 1054 (9th Cir. 2017) (quoting Restatement

11  (Third) of Agency ("Restatement") § 1.01). The principal must have the "right to control" the

12  actions of the agent. Restatement § 1.01, cmt c.

13       1.    A reasonable jury could find that Performance Media was PillPack's agent.

14       PillPack's contract requires Performance Media to transfer potential customers to

15  PillPack subject to PillPack's control. (Dkt. No. 229-26 (Exhibit A ¶ 3 (Performance Media "shall

16  transfer potential opt-ins to PillPack on a real-time basis through such data transfer platform(s)

17  as directed by PillPack")), (Exhibit A ¶ 1 (all "scripts and messaging used in connection with any

18  Campaign shall be approved by PillPack in advance")), (Terms and Conditions ¶ 1(b) (PillPack

19  "shall provide [Performance Media] all design, content, text, graphics, images or other relevant

20  information (collectively the 'Advertising Creative') necessary for Provider to perform the

21  Services contemplated by the applicable Insertion Order")).)

22       PillPack could control Performance Media's compliance with the TCPA. The contract

23  required Performance Media to "cause [its] media sources to maintain documented evidence of

24  consent for each lead" and to "promptly provide such documentation to PillPack, at any time

25  and from time to time, upon request." (Dkt. No. 229-26 (Terms and Conditions ¶ 4(g).) The

26  contract also required Performance Media to "promptly report to PillPack any consumer

27  revocation of consent of which it becomes aware, regardless of the time or manner in which

1    such revocation of consent may be made." (*Id.*) And the contract required Performance Media

2    to "notify PillPack immediately (within five business days) in writing in the event that

3    [Performance Media] or any shareholder, member director, manager, officer, employee or

4    independent contractor providing services for [Performance Media] fail[ed] or cease[d] to

5    satisfy the terms and conditions" of any of the contract's representations and warranties. (*Id.*

6    (Terms and Conditions ¶ 4(h).) By signing the contract, Performance Media manifested assent.

7         The contract says that Performance Media is an "independent contractor," but an

8    independent contractor "may or may not be an agent." Restatement § 1.01, cmt. c. The

9    cornerstone of agency is whether the agent "enter[s] into transactions on the principal's

10   account." *Id.* Performance Media did exactly that when it hired Prospects and its call center

11   vendors to call potential PillPack customers using soundboard technology (John the Robot or

12   avatar) to deliver a PillPack-approved script that described PillPack's unique multi-packing

13   service, including payment terms, and obtain permission to transfer the potential customers to

14   PillPack's call centers. PillPack controlled the timing, and volume of the calls. (Dkt. No. 63 ¶ 2;

15   Dkt. No. 229-27; Dkt. No. 98-13; Dkt. No. 98-14; Dkt. No. 98-15.) PillPack actively managed the

16   campaign, directing budgeting and performance. (Dkt. No. 98-1 at 36:14-20, 45:11-46: 21, 94:5-

17   15.) PillPack knew about and approved use of an avatar to make the calls. (Dkt. No. 229-5 at

18   70:25-71:12, 148:8-10; Dkt. No. 229-9 at 90:1-91:3; Dkt. No. 229-18; Ex. 3 at 79:18-81:19,

19   58:23-59:23.) PillPack provided information for the script and approved the script used to make

20   the calls. (Dkt. No. 98-2 at 112:1-113:18; Dkt. No. 229-5 at 113: 24-15, 153:16-25; Dkt. No. 229-

21   21 at BYTE-SUCCESS_000011; Ex. 3 at 76:4-20.)

22         This evidence is sufficient to create an issue of fact for the jury on whether Performance

23   Media was PillPack's agent. *See Braver v. NorthStar Alarm Servs., LLC*, 2019 WL 3208651, at

24   *11–12 (W.D. Okla. July 16, 2019) (finding agency where defendant hired third party to place

25   calls, was involved in drafting script, knew an avatar was used, received live transfers, and

26   provided purported agent regular reports); *Lushe v. Verengo Inc.*, 2014 WL 5794627, at *5–6

27   (C.D. Cal. Oct. 22, 2014) (triable issue of fact on classical agency where defendant reviewed,

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 13
Case No. 3:19-cv-05282-DGE

1   edited, and provided input for script, communicated with caller about call quality, provided

2   access to dedicated phone lines for call transfers, plus evidence caller used an ATDS).

3       2.    A reasonable jury could find Performance Media's vendors were PillPack's
             subagents.

4

5       PillPack argues that Prospects and its call center vendors cannot be its agents because

6   PillPack did not contract with Prospects or its call center vendors. But PillPack ignores the "well-

7   established legal principle" of subagency. *See Soma Surgery Center, Inc. v. Aetna Life Ins. Co.*,

8   2018 WL 1989442, at *2 (C.D. Cal. April 11, 2018) (citing Restatement § 3.15). A subagent is a

9   person "appointed by an agent to perform functions that the agent has consented to perform

10  on behalf of the agent's principal and for whose conduct the appointing agent is responsible to

11  the principal." *Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817, 832 (N.D. Ill. 2016)

12  (quoting Restatement § 3.15). An agent may appoint a subagent where the agent "reasonably

13  believes, based on a manifestation from the principal, that the principal [expressly or impliedly]

14  consents to the appointment of a subagent." *Desai v. ADT Sec. Sys., Inc.*, 78 F. Supp. 3d 896, 904

15  (N.D. Ill. 2015).

16      The evidence shows that Performance Media reasonably believed PillPack consented to

17  Performance Media appointing Prospects and its vendors to place the calls. S*ee Grant v. Regal

18  Auto. Grp.*, 2020 WL 8254283, at *8–9 (M.D. Fla. July 30, 2020) (finding genuine issue of

19  material fact regarding subagency where contract between alleged principal and alleged agent

20  referenced use of third parties on campaign), *R&R adopted by Grant v. Regal Auto. Grp.*, 2020

21  WL 8224838, at *1 (M.D. Fla. Sept. 29, 2020). The contract refers to Performance Media's

22  "agents" or "subcontractors" multiple times. (*See, e.g.,* Dkt. No. 229-26 (Terms & Conditions ¶¶

23  4(a), 4(d), 4(e), 4(h), 6(a)).) Anderson testified that PillPack knew Performance Media appointed

24  Prospects to place calls. (Dkt. No. 229-7 at 122:15-124:12.) PillPack approved Performance

25  Media's use of "offshore" call center vendors. (Dkt. No. 98-8.) And Hunt testified that he knew

26  the calls were being placed using the name "Helping Hands," which was Yodel's DBA. (Ex. 3 at

27  107:18-25.) As fictitious business name registrations are a matter of public record, this

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 14
Case No. 3:19-cv-05282-DGE

1  information was sufficient to put PillPack on notice that Performance Media appointed

2  Prospects and its call center vendors as subagents by hiring them to place the calls. This

3  evidence raises a genuine issue of material fact as to whether PillPack expressly or impliedly

4  authorized Performance Media to retain subagents—Prospects and its call center vendors—to

5  place the calls. *See Lushe*, 2014 WL 5794627, at *5 (evidence that agent was "outsourcing the

6  placement of calls" raised issue of fact as to whether defendant authorized agent to "engage a

7  subcontractor" and "accepted the legal consequences of that").

8       As discussed above, *Kristensen* analyzes only ratification, not implied actual authority of

9  subagency. There is no discussion in *Kristensen* of contract terms like the ones here that

10 expressly contemplate that work may be done by vendors or subcontractors. And the contract

11 in *Schick v. Caliber Home Loans, Inc.*, 2021 WL 4166906, at *1 (N.D. Cal. Sept. 12, 2021),

12 expressly "prohibited" Caliber's alleged agent "from subcontracting without advance

13 authorization." PillPack's contract with Performance Media does the opposite—it expressly

14 acknowledged that vendors or subcontractors would be used to carry out the Performance

15 Media's work under the contract. (*See, e.g.,* Dkt. 229-26 (Terms & Conditions ¶¶ 4(a), 4(d), 4(e),

16 4(h), 6(a)).)

17       3.       A reasonable jury could find Performance Media had implied actual authority to
18               run the PillPack campaign through third party calling vendors.

19       When an agency relationship exists, the next step is to determine whether the agent

20 acted within the scope of its authority, which may be implied by conduct and proven

21 circumstantially. Restatement § 2.02, cmt. c. "While express actual authority is proven through

22 words, implied actual authority is established through circumstantial evidence." *Id.* "A principal

23 grants implied actual authority to an agent when the principal's reasonably interpreted words

24 or conduct would cause an agent to believe that the principal consents to have an act done on

25 her behalf." *Aranda*, 179 F. Supp. 3d at 831; Ex. 19 (Final Jury Instructions at 5-6), *Krakauer v.*

26 *Dish Network L.L.C.*, No. 1:14-cv-00333-CCE-JEP (N.D. W.Va. Jan. 19, 2017), ECF No. 293); *see*

27 *also Salyers v. Met. Life Ins. Co.*, 871 F.3d 934, 940 (9th Cir. 2017).

1    Ample evidence shows Performance Media and its subagents acted within the scope of

2    their authority. As Grant said in a declaration dated 2020, he agreed that "Prospects DM, or our

3    subcontracted call centers, would place and transfer qualified leads to PillPack." (Dkt. 37-17 ¶

4    6.) PillPack dictated the calls' substance, volume, and timing. Performance Media

5    communicated that information to Prospects and its call center vendors. There is no evidence

6    that Prospects or its vendors deviated from PillPack's instructions to Performance Media;

7    instead, the calls were "exactly as ordered" by PillPack. (Dkt. No. 229-25.)

8        PillPack impliedly authorized Performance Media and its vendors to place calls without

9    verifying that they had prior express written consent as the TCPA requires. Despite generally

10   requiring "trusted form" verifications of TCPA consent, PillPack "did not deploy [its] trusted

11   form" here because Performance Media "was generating their own leads under their own

12   DBA." (Dkt. No. 98-3 at 203:7-11, 204:15-24.) As a result, PillPack allowed Performance Media

13   to strike its form contract term requiring vendors to "employ an end user opt in verification

14   selected by PillPack." (Dkt. No. 229-29 at PP_000869.)

15       PillPack relies on *Thomas v. Taco Bell Corp.* and argues that PillPack did not control the

16   manner and means by which Performance Media's vendors placed the calls. Taco Bell was far

17   removed from the decision to engage in marketing efforts via text messages. 879 F. Supp. 2d

18   1079, 1085 (C.D. Cal. 2012), *aff'd*, 879 F. App'x 678 (9th Cir. 2014). Taco Bell's involvement

19   consisted of funding a separate legal entity that managed and controlled its marketing and

20   hired the vendors who designed the marketing campaign that sent unlawful texts. *Id.* at 1081-

21   82. Taco Bell did not request or approve the marketing campaign that resulted in the unlawful

22   texts, nor did it develop or approve the message. *Id.* at 1085. Here there is at least a dispute of

23   fact about whether PillPack controlled the manner and means by which the calls were placed

24   through its agent Performance Media. PillPack hired Performance Media to generate leads,

25   established, owned, and maintained the phone number used for the live transfers, approved

26   the campaign script, actively managed the campaign, including the call timing and volume,

27

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1   regularly communicated with Dorf both directly and through its liaison Anderson, and had its

2   own call center employees market its services to consumers as part of the campaign.

3       PillPack suggests that if it was not directly communicating with the call center vendors it

4   cannot be liable for the calls they placed and then transferred directly to PillPack. But that

5   ignores key tenants of subagency. What matters is whether the "appointing agent"—here

6   Performance Media—is responsible to the principal—here PillPack. Restatement (Third) of

7   Agency § 3.15. And Performance Media was. Dorf received directions from PillPack on the

8   content of the script, use of an avatar to place calls, the volume of calls, the time they could be

9   placed. He gave those directions to Grant and Prospects, and they were followed. As Dorf put it,

10   the calls were "exactly as ordered" by PillPack. (Dkt. No. 229-25.)

11       None of the remaining cases PillPack cites support its contention that it lacked sufficient

12   control over Performance Media or its subagents to confer implied actual authority. *See Meeks*

13   *v. Buffalo Wild Wings, Inc.*, 2018 WL 1524067, at *6 (N.D. Cal. Mar. 28, 2018) (plaintiff did not

14   allege that defendant Yelp had any control over its co-defendant's texts and the record showed

15   the co-defendant dictated whether and when texts were sent).

16       4.   *Jones* does not preclude a finding of actual authority on these facts.

17       Relying on *Jones v. Royal Administration Services, Inc.*, 887 F.3d 443 (9th Cir. 2018),

18   PillPack asserts that actual authority "cannot extend liability for a TCPA violation to the

19   principal where the contract between the principal and its agent expressly prohibits TCPA-

20   violating calls." (Mot. at 12-14.) But in *Jones* there was no "record evidence contradicting this

21   limitation on [the agent's] authority." 887 F.3d at 489.

22       The evidence here shows PillPack impliedly authorized Performance Media to violate

23   the TCPA. PillPack contracted with Performance Media knowing that the creative used to

24   generate the opt-ins for the calls did not include its name (Dkt. No. 229-5 at 97:9-13) and that

25   the campaign used a prerecorded voice (*id.* at 70:25-71:12, 148:8-10). That is authorization to

26   make prerecorded voice calls without proper consent under the TCPA. PillPack may have

27   believed consent to be called by its agents or their DBAs was valid consent or that the avatar

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 17
Case No. 3:19-cv-05282-DGE

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    did not qualify as a prerecorded voice. PillPack may have made a mistake based on its

2    understanding of the law. *See FTC Advisory Opinion/Comment Letter on Soundboard*

3    *Technology*, 2016 WL 4795392 (F.T.C. Nov. 10, 2016) (confirming avatar calls are prerecorded

4    voice calls); *Braver*, 2019 WL 3208651, at *6 (same); *Johnson v. Comodo Grp., Inc.*, 2020 WL

5    525898, at *7-8 (D.N.J. Jan. 31, 2020) (same); *Naiman v. Blue Raven Solar, LLC*, 2021 WL

6    4395049, at *6 n.93 (D. Nev. Sept. 24. 2021) ("Blue Raven may have thought that its hands-off

7    approach would circumvent the attachment of vicarious liability if Renovation violated any

8    laws, but a jury might reasonably find that it attaches for that very reason."). But it authorized

9    the campaign to run exactly as it did. In contrast, the contract in *Jones* prohibited "robo-

10   calling." 887 F.3d at 446–47 (agreement excluded from authorized marketing methodologies

11   "any act or omission that violates applicable state or Federal law, including but not limited to

12   'robo-calling'").

13        Extending *Jones* to any case where the contract generally prohibits an alleged agent

14   from violating the law would allow principals to evade the TCPA with generic contract

15   provisions even when—as here—the principal makes no effort to ensure the requirement is

16   enforced and, in fact, directs the agent to use technology that risked violating the TCPA. That

17   outcome would undermine the FCC's ruling that the seller is in the best position to "monitor

18   and police" its third-party telemarketers. *In re Dish*, 28 FCC Rcd. at 6588.

19        PillPack also discusses some of the factors in the ten-factor test outlined in *Jones*. But

20   *Jones* says that the test is "limited to the issue before the court," which was "whether a

21   principal, who has hired third-party telemarketers, exercises sufficient control to be held

22   vicariously liable under the TCPA *to the same degree that an employer may be held liable for*

23   *the actions of its employees*." 887 F.3d at 451 n.4. The court "express[ed] no opinion on the

24   usefulness" of the test for other theories of agency. *Id*. Because Williams does not claim that

25   PillPack is liable to the same degree as an employer, the *Jones* multi-factor test is irrelevant.

26   And Williams has put forward evidence that PillPack approved the script for the calls, set the

27   number of live transfers it received, and the hours when calls were placed and transfers sent,

1  unlike in *Knapp v. Sage Payment Solutions, Inc.*, 2018 WL 659016, at *3 (N.D. Cal. Feb. 1, 2018).

2  **D.   A reasonable jury could find that Performance Media's subagents had apparent**
3  **authority to place the calls.**

4  "Apparent authority arises by 'a person's manifestation that another has authority to

5  act with legal consequences for the person who makes the manifestation, when a third party

6  reasonably believes the actor to be authorized and the belief is traceable to the

7  manifestation.'" *Mavrix*, 873 F.3d at 1055 (quoting Restatement § 3.03). The principal's

8  manifestations may be "direct statements to the third person" or "granting of permission to the

9  agent to perform acts . . . under circumstances which create in [the alleged agent] a reputation

10 of authority." *Id.* (internal citation and quotation marks omitted).

11 Any person who gets a call describing PillPack's signature service and is transferred

12 directly to a PillPack employee who tries to sell PillPack's services would believe PillPack or

13 someone authorized by PillPack placed the initial call. The PillPack call center employees who

14 "announced" PillPack's identity (Dkt. No. 82 at 25), are the source of that reasonable belief. And

15 that is what Williams thought, which is why he told PillPack: "I need you to please, ummm, stop

16 calling people with the automated phone call. That is very, very illegal." (Dkt. No. 64 at 40; Dkt.

17 No. 98-20 at 40:10-16.) Unlike the cases PillPack relies on, PillPack made an affirmative

18 manifestation directly to Williams and all members of the proposed class when its call center

19 employees identified themselves as PillPack.[2]

20 *Braver* is the case most directly on point. 2019 WL 3208651, at *13. There, the district

21 court addressed a live transfer campaign like PillPack's and found the defendant vicariously

22 liable under an apparent authority theory for calls placed by Yodel—the same Prospects

23 affiliate that Grant testified placed the calls at issue here. *Id.* In doing so, the court relied on

24 evidence that the defendant approved the avatar script, the script accurately described the

25 ───────────
[2] For example, neither *Rogers v. Postmates Inc.*, 2020 WL 1032153, at *4 (N.D. Cal. Mar. 3,
26 2020), nor *Makaron v. GE Sec. Mfg., Inc.*, 2015 WL 3526253 (C.D. Cal. May 18, 2015) involved
calls live transferred by the alleged agent to the alleged principal or statements made by the
27 alleged principal directly to the plaintiff.

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 19
Case No. 3:19-cv-05282-DGE

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  defendant's product, and the defendant accepted the live transfers. *Id.* at *8, 13. The court

2  explained that the defendant demonstrated to the consumers called, by both its conduct

3  toward them, and its conversations with the called persons, that Yodel (using a fictitious name)

4  had the apparent authority to place the initial calls. *Id.* at *13.

5        The same is true here. PillPack says it never said anything that would give a "reasonable

6  observer" the impression that PillPack authorized the calls. But from the perspective that

7  matters—that of the called consumers, each call was a single transaction. A robot named

8  "John" called the consumer and described a "pharmacy partner" providing PillPack's multi-

9  packing service: "they also pre-sort your daily medications into individual time-of-day packets."

10  (Dkt. No. 229-22.) Rather than a "generic" description of pharmacy services, this is a PillPack-

11  approved description of multi-packing. (Dkt. No. 229-1 at 122:4-17; Dkt. No. 229-2 at 66:17-

12  68:13.) The robot then said, "I'd like to transfer to you to <u>our</u> pharmacy representative now to

13  tell you more about the service, is that OK?" (Dkt. No. 229-22 (emphasis added).) Then the

14  consumer went directly to a PillPack employee who identified the company by name and tried

15  to sell PillPack's service.

16        The district court's analysis in *Kristensen* does not help PillPack here either. Those

17  plaintiffs could not point to any statements made directly to them by the alleged principals that

18  caused them to think the alleged agents had authority to send texts. By contrast, Williams

19  points to both the content of the PillPack-approved robocall script and statements PillPack's call

20  center agents made to him and all class members.

21        The only case PillPack cites that involves live transfers is *Abante Rooter & Plumbing, Inc.*

22  *v. Arashi Mahalo LLC*, but there the plaintiff "did not develop the record in any meaningful way"

23  to support his theories of vicarious liability. 2019 WL 6907077, at *1 (N.D. Cal. Dec. 19, 2019).

24  Nonetheless, the court concluded that the transfer would lead a consumer to conclude the

25  caller had authority to procure leads for the alleged principal. *Id.* The court found that the

26  alleged principal did not say anything suggesting the caller had authority to use an ATDS. But

27  here when consumers complained about "John," PillPack call center agents acknowledged that

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 20
Case No. 3:19-cv-05282-DGE

they knew "John" was a recorded voice and identified the calling party as "PillPack Pharmacy":

> [CONSUMER]: (0:11) Oh, I thought that other name was gonna talk… John.
> [PILLPACK]: (0:14) Yeah, well that's—
> [CONSUMER]: (0:16) Is he there?
> [PILLPACK]: (0:17) That's, that's a recording. That's a recorded voice. So.
> [CONSUMER]: (0:21) Ok. I thought it was a recording. Who is this with? I kept asking who it was with and he kept hanging up on me.
> [PILLPACK]: (0:28) Yeah. This is PillPack Pharmacy. So we are, uh, the pharmacy that, uh, presorts your medication for you. And ships it to your house free of charge.

(Dkt. No. 248-1 (Transcript of February 26, 2019, call transferred to PillPack on the DNIS PillPack established for the Performance Media campaign).)

PillPack makes a policy argument that a finding of apparent authority here would make potential liability boundless. But Williams seeks to hold PillPack accountable for only the calls that PillPack's own records show were transferred to PillPack as part of a single telemarketing campaign from which PillPack profited. PillPack's policy argument is unpersuasive.

**E.    A reasonable jury could find that PillPack ratified the conduct of Performance Media's call center vendors by accepting the benefits of the transferred calls despite red flags.**

"Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." *Henderson*, 918 F.3d at 1073 (quoting Restatement § 4.01). There are two ways to ratify a third party's acts: (1) knowing acceptance of the benefit where there is an objective indication that the principal exercised choice and consented to the acts of the agent; and (2) willful ignorance, where the principal may not know the material facts but ratifies the purported agent's conduct with "awareness that such knowledge was lacking." *Id.* (citing Restatement § 4.01 cmt. d).

A principal may ratify acts done by an agent or a person who purports to be one. Restatement § 4.01 cmt. b. PillPack argues that under *Kristensen* and *Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003), PillPack cannot have ratified the acts of Prospects DM's vendors because it did not contract with them. But after *Kristensen*, the Ninth Circuit rejected that reasoning and held that "ratification creates consequences of actual authority, including, in some

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  circumstances, creating an agency relationship when none existed before. *Henderson*, 918 F.3d

2  at 1073.

3        If a principal "has knowledge of facts that would have led a reasonable person to

4  investigate further, but the principal ratified without further investigation," the principal has

5  "assumed the risk of liability" and is vicariously liable. *Kristensen*, 879 F.3d at 1014. A

6  reasonable jury could conclude that PillPack had actual knowledge that the calls were placed

7  without the prior express consent required by the TCPA. First, PillPack knew Performance

8  Media was going to be placing calls using prerecorded voice messages and that Performance

9  Media itself was not maintaining documented evidence of prior express consent. PillPack

10  manifested assent to this arrangement by signing a contract stating that Performance Media

11  would "cause its media sources" to maintain evidence of consent. PillPack knew the "creatives"

12  Performance Media used to obtain purported consent did not list either PillPack or

13  Performance Media as a company the consumer was agreeing to receive calls from. Instead,

14  PillPack knew Performance Media was generating the leads under a fictitious name. (Dkt. No.

15  229-5 at 97:9-13, 100:9-14.) PillPack knowingly assumed the risk that such consent was not

16  sufficient. Judge Zilly agreed with Williams' position that it is not. (Dkt. No. 140 at 11–14).

17        There were numerous "red flags," that should have led PillPack to investigate whether

18  Performance Media or its subagents obtained prior express written consent. Consumers

19  complained to PillPack call center agents, including that they did not want to be transferred to

20  PillPack. None of the cases on which PillPack relies discuss evidence of consumer complaints

21  made directly to the purported principal. *See, e.g., Kristensen*, 2015 WL 4477425, at *3 (plaintiff

22  relied on lenders' "general knowledge" of the industry); *Armstrong v. Investor's Business Daily,*

23  *Inc.*, 2020 WL 2041935 (C.D. Cal. Mar. 6, 2020) (plaintiff relied on a lawsuit against the caller of

24  which alleged principal was unaware). PillPack suggests that complaints cannot raise a red flag

25  unless the consumer says, "you called me in violation of the TCPA." That makes no sense and

26  would encourage sellers to ignore warning signs about calls made without consent. And here

27  consumers did complain about prerecorded voice calls.

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 22
Case No. 3:19-cv-05282-DGE

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    *Schick v. Caliber Home Loans, Inc*, 2021 WL 4166906, does not present facts "identical,"

2    or even similar, to those here. In *Schick*, the defendant Caliber's contract prohibited the use of

3    subcontractors, 2021 WL 4166906, at *1, and Caliber instructed its alleged agent to

4    "immediately stop all leads" after receiving consumer complaints, *id.* at *2. The court in *Schick*

5    wrote that if Caliber had ignored complaints, "there might be a genuine dispute as to vicarious

6    liability" but there was no issue because Caliber "prodded NexLevel about its TCPA compliance,

7    promptly demanded a pause in lead generation, and cancelled its contract with NexLevel

8    altogether soon thereafter." *Id.* at *2. PillPack did none of those things.

9    PillPack says it raised concerns with Dorf about do-not-call requests and complaints and

10   he told PillPack not to worry. But PillPack did not question Dorf's assurance even though

11   PillPack wasn't "expecting any other response" because people in marketing don't admit

12   problems with their leads. (Dkt. No. 98-1 at 65:1-67:3.) PillPack didn't investigate whether

13   Performance Media had consent to call the consumers making DNC requests; although she

14   managed the campaigns, Ranneberg did not consider that to be her responsibility. (*Id.* at

15   155:16-158:20.)

16   PillPack continued to accept Performance Media's leads for two months after Williams

17   filed this lawsuit. It did so despite knowing that Performance Media was the source of the call

18   to Williams and that the only proof of purported consent Performance Media could supply was

19   an "opt-in" in the name of Michael Morgan. And when Ranneberg called Dorf about this

20   lawsuit, she did not ask whether he called Williams, what voice technology was used, or for

21   documented evidence that Williams consented to be called. (*Id.* at 124:8-128:23.) And when

22   PillPack finally terminated the relationship with Performance Media, it did so along with all

23   other live transfer campaigns, not because of any concern about TCPA violations, but because

24   PillPack wanted to change its marketing strategy to "generate new customers at a lower cost

25   per acquisition." (*Id.* at 164:16-22; Dkt. No. 98-3 at 37:1-4.)

26   PillPack wrongly maintains that there is no evidence that it benefitted from the unlawful

27   calls because Williams did not buy PillPack's services. Mot. at 23-24. Numerous courts have

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 23
Case No. 3:19-cv-05282-DGE

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1   rejected this argument. *Abante Rooter & Plumbing, Inc. v. Alarm.com,* 2018 WL 3707283, at *5

2   (N.D. Cal. Aug. 3, 2018) (finding ratification a question for the jury even though plaintiffs did not

3   purchase services where Alarm.com accepted thousands of dollars in sales despite being aware

4   of concerns about the practices of entity placing the calls). In *Aranda*, the court found a triable

5   issue of fact even though the named plaintiffs did not purchase anything where the evidence

6   showed the defendants were aware of unlawful telemarketing calls but "continued to accept

7   business flowing" from those calls. 179 F. Supp. 3d at 833. PillPack also continued to accept the

8   "steady stream of leads" that Performance Media generated (Dkt. No. 98-1 at 147:6-12), and

9   the thousands of consumer sign ups from those leads, despite consumers' complaints.

10       A reasonable jury could conclude that PillPack ratified Performance Media's calling

11   campaign by continuing to use the leads to generate sales despite complaints about the calls.

12                          **IV.**    **CONCLUSION**

13       For the foregoing reasons, Williams respectfully requests that the Court deny PillPack's

14   second motion for summary judgment on the issue of vicarious liability (Dkt. No. 252).

15       RESPECTFULLY SUBMITTED AND DATED this 11th day of July, 2022.

16                     TERRELL MARSHALL LAW GROUP PLLC

17

18                     By: /s/ Jennifer Rust Murray, WSBA #36983
                           Beth E. Terrell, WSBA #26759

19                         Email: bterrell@terrellmarshall.com
                           Jennifer Rust Murray, WSBA #36983

20                         Email: jmurray@terrellmarshall.com
                           Adrienne D. McEntee, WSBA #34061

21                         Email: amcentee@terrellmarshall.com
                           Blythe H. Chandler, WSBA #43387

22                         Email: bchandler@terrellmarshall.com
                           936 North 34th Street, Suite 300

23                         Seattle, Washington 98103-8869
                           Telephone: (206) 816-6603

24

25

26

27

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Walter M. Smith, WSBA #46695
Email: walter@smithdietrich.com
Steve E. Dietrich, WSBA #21897
Email: steved@smithdietrich.com
SMITH & DIETRICH LAW OFFICES PLLC
3905 Martin Way East, Suite F
Olympia, Washington 98506
Telephone: (360) 915-6952

Anthony I. Paronich, *Admitted Pro Hac Vice*
Email: anthony@paronichlaw.com
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, Massachusetts 02043
Telephone: (617) 485-0018
Facsimile: (508) 318-8100

*Attorneys for Plaintiff and the Proposed Class*

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 25
Case No. 3:19-cv-05282-DGE

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com