1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8
9
10

| | |
|---|---|
| AARON WILLIAMS, on behalf of himself and all others similarly situated,<br><br>      Plaintiff,<br><br>  v.<br><br>PILLPACK LLC,<br><br>      Defendant. | CASE NO. 3:19-cv-05282-DGE<br><br>ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 252) |

11
12
13
14
15
16
17
18
19
20
21
22
23
24

## I      INTRODUCTION

This matter comes before the Court on Defendant PillPack LLC's ("PillPack") Motion for Summary Judgment.  (Dkt. No. 252.)  The Court has considered the pleadings filed in support of and opposition to the motion and the remainder of the record and DENIES Defendant's motion for the reasons discussed herein.

## II      BACKGROUND

The Court has discussed the factual and procedural background in previous orders and incorporates them by reference.  (Dkt. Nos. 140 at 1–4; 220 at 1–9.)  Plaintiff Aaron Williams

alleges that on March 14 and April 10, 2019, he received calls from a telemarketer using a prerecorded voice message asking if he was interested in a pharmacy service that ships medications directly to his house.  (Dkt. No. 6 at 1.)  When Williams expressed interest in the service, the call was transferred to a PillPack sales representative.  (*Id*. at 3.)  Williams argues the calls were made in violation of two subsections of the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 et seq. ("TCPA"): 1) calls made using an automated telephone dialing system ("ATDS") or an artificial or prerecorded voice without "the prior express consent of the called party," and 2) calls placed to numbers listed on the DNC Registry.  (*See generally id*.)

Williams sues PillPack personally and as the representative of a class of similarly situated persons.  (Dkt. No. 6 at 5.)  He claims PillPack is vicariously liable for the telemarketer's violations of the TCPA because PillPack knowingly or willfully caused the autodialed calls to be made to his cell phone despite his lack of consent.  (*Id*. at 3–4.)  Williams seeks statutory damages under the TCPA.  (*Id*. at 8.)

### A.  Factual Background

PillPack is a full-service pharmacy that delivers medications to customers' homes.  (Dkt. No. 62 at 1.)  Part of its services include "multi-packing," where the company groups a customer's medications into distinct packs based on what days the customer is supposed to take them.  (Dkt. No. 229-1 at 4–5.)  In early 2018, PillPack engaged Performance Media to call potential customers ("leads") and transfer leads who were interested in PillPack's services to PillPack's inbound call center.  (Dkt. No. 62 at 2.)  As part of the agreement between PillPack and Performance Media, Performance Media agreed that:

> performance of the Services is in compliance with the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227.  All leads generated by Provider conform to the express written consent requirements of the TCPA.  Provider shall

1    cause Provider's media sources to maintain documented evidence of consent for
2    each lead and Provider shall promptly provide such documentation to PillPack, at
     any time and from time to time, upon request.  Provider shall promptly report to
3    PillPack any consumer revocation of consent of which it becomes aware, regardless
     of the time or manner in which such revocation of consent may be made.

4    (Dkt. No. 229-26 at 6.)

5         According to the contract, Performance Media was considered an independent contractor

6    that was to "perform the Services under PillPack's general direction" and "in accordance with

7    the terms of this Agreement," but Performance Media would "determine, in [its] discretion, the

8    manner and means by which the Services are accomplished," subject to an "express condition

9    that [Performance Media] will at all times comply with applicable law." (*Id*. at 8.)

10        Performance Media did not place any calls to generate leads.  (Dkt. No. 253 at 14–15.)

11   Instead, it contracted with Prospects DM to generate leads that would then be transferred to

12   PillPack call centers.  (Dkt. No. 37-17 at 5.)  The calls "would be placed using a prerecorded

13   voice system which is sometimes described . . . as an Avatar or an IVR (interactive voice

14   response) system."  (Dkt. No. 34 at 2.)  The prerecorded message would start by saying that the

15   agent's name was "John" and then describe how "one of our pharmacy partners" provided daily

16   packets of pre-sorted medications prescribed to a patient.  (Dkt. No. 229-22 at 2.)  If the lead

17   showed that they were interested in the service, the call would then be transferred to PillPack's

18   call centers where a live sales agent would speak with the lead.  As described by Prospects DM's

19   owner, the script was intentionally vague because the call "could end up going to any potential

20   pharmacy buyer" that was a client of Performance Media, not exclusively PillPack.  (Dkt. No.

21   253 at 25.)

22        Like Performance Media, Prospects DM did not make any calls but contracted with one

23   or more vendors to place calls.  (Dkt. No. 253 at 8, 12, 15–16.)  The record is still unclear

24

1    concerning how many vendors Prospects DM engaged to make calls on behalf of PillPack.  (*Id.*

2    at 29.)  As understood by the Court, Prospects DM, or one of its vendors, would source leads and

3    create call lists of participants based on their response to online "opt-in consent" forms on

4    various websites where they agree to be contacted by email or an ATDS from various promotors.

5    (Dkt. No. 64 at 1–10.)  Prospects DM had "no direct control over the websites that [its] lead

6    vendors use[d] to collect the data."  (Dkt. No. 37-17 at 6.)  When the PillPack call center agents

7    received the transferred calls they would be unable to identify which vendors placed the calls

8    initially.  (Dkt. No. 84 at 2.)

9        **B.  The Williams Calls**

10           Williams received two calls from a prerecorded message that introduced itself as "John"

11    with Senior Help Advisors, a Prospects DM business name.  (Dkt. Nos. 30-6 at 2; 64 at 36.)  The

12    prerecorded message asked if anyone in the household used prescription medications, to which

13    Williams responded "yes" both times.  (Dkt. No. 64 at 36.)  On both calls the prerecorded

14    message explained that "[o]ne of our pharmacy partners makes managing your medications

15    easy[,]" and described a multi-packing service that PillPack provides.  (*Id.*)  Once Williams

16    responded "yes," the prerecorded message responded "I'd like to transfer you to a pharmacy

17    representative now to tell you more about the service. Is that okay?"  (*Id.*)  Once Williams

18    confirmed that he wanted to be transferred, he was transferred to PillPack's call center.  (Dkt.

19    No. 253 at 60.)  On the March 14 call, Williams was transferred to a PillPack employee who

20    identified the company by name and tried to sell PillPack's services.  (Dkt. No. 64 at 38.)  On the

21    April 10 call, Williams was transferred but never able to speak to anyone at PillPack.  (Dkt. No.

22    253 at 60.)

23        **C.  Prospects DM's Vendors**

24

1    After years of discovery, the Parties still do not know which of Prospects DM's vendors

2    ("Unknown Vendor") placed the calls to Williams.  It was originally understood by both parties

3    that Prospects DM's vendors would source leads and then Prospects DM would place the calls

4    on behalf of PillPack during the campaign.  (*See generally* Dkt. Nos. 29, 60.)  PillPack produced

5    an opt-in consent form from someone named Michael Morgan, who consented to receive

6    marketing calls on the phone number owned by Williams, by entering that phone number on the

7    website www.sweepstakescentralusa.com, one of the websites Yodel Technologies, a Prospects

8    DM vendor, used to source leads.  (Dkt. Nos. 30-7 at 4; 64 at 1.)

9    Through discovery it was determined that Prospects DM hired vendors to make the calls

10   on behalf of PillPack, including Yodel.  (Dkt. No. 179-4 at 11–12.)  But after additional

11   discovery from Yodel, it was determined that Yodel's records of calls placed on behalf of

12   PillPack did not include calls placed to Plaintiff's phone number.  (*Id.* at 14–16.)

13   **D.  Procedural Background**

14   On September 3, 2020, PillPack moved for summary judgment on the understanding that

15   Prospects DM placed the calls to Plaintiff.  (Dkt. No. 82.)  On January 8, 2021, the Honorable

16   Thomas S. Zilly denied PillPack's motion.  (Dkt. No. 126.)  Judge Zilly found genuine issues of

17   material fact as to "whether Defendant gave actual authorization, express or implied, to

18   Performance Media to allow a third party to make unlawful calls on Defendant's behalf" and

19   "whether Defendant had actual knowledge of the third party's placement of calls using a

20   prerecorded voice system."  (*Id.* at 2–3.)

21   On July 24, 2020, Plaintiff moved to certify a class of individuals against PillPack.  (Dkt.

22   No. 29.)  On February 12, 2021, Judge Zilly granted in part Plaintiff's motion for class

23   certification.  (Dkt. No. 140.)  In his order, Judge Zilly found that Defendant did not "dispute that

24

during the relevant period, the website opt-in forms failed to list 'PillPack' as a Marketing

Partner who could call the proposed Class Members." (*Id*. at 13.)  Judge Zilly also rejected

PillPack's argument that it could "avoid TCPA liability so long as the called parties provided

written consent to be called by Prospects DM, and that once called, the called party need only

provide oral consent to be transferred to Defendant" as lacking statutory or regulatory support.

(*Id.*)  Even if the Court assumed that "written consent to be called by Prospects DM was

sufficient for purposes of the TCPA," PillPack still presented no evidence that the opt-in form

"listed Prospects DM (or one of its fictitious names) as a Marketing Partner before the Class

members were called." (*Id.* at 14.)  As such, Judge Zilly found that "Defendant has not

identified a single instance in which a proposed Class member gave prior written consent" and

therefore concluded that "the lack-of-consent issue has the capacity to generate a common

answer" for the purposes of class certification.  (*Id.*)

Other commonalities existed among the proposed class.  For example, Judge Zilly found

that "individual inquiry is not necessary to resolve whether the calls at issue were conducted

using an ATDS or a prerecorded voice" because PillPack failed to "identify even one call in

which a live voice was used exclusively" to contact leads.  (Dkt. No. 140 at 15–16.)  The Court

found that "[f]rom the beginning of the Campaign, Defendant was aware that 'an avatar

recording' was being used to make the calls" to potential customers.  (*Id.* at 15.)

Based on the record before him, Judge Zilly certified the following class:

All persons or entities within the United States, whose telephone number was
obtained by Prospects DM from Yodel Technologies, LLC or Fluent, Inc., and who
between March 13, 2018, and June 16, 2019, received a non-emergency telephone
call promoting goods or services on behalf of PillPack, LLC, as part of the PillPack
Performance Media campaign:

(a) to a cellular telephone number through the use of an automatic telephone
    dialing system or an artificial or prerecorded voice; or

1

2

      (b) to a cellular or residential telephone number that had been registered on the national Do Not Call Registry for at least 31 days and who received more than one call as part of the PillPack Performance Media campaign within any twelvemonth period.

3

4

      Transfers Sub-Class: All Class members who were transferred at least once to a PillPack call center on the Dialed Number Identification Service at: 866-298-0058.

5

(Dkt. No. 140 at 19.)  Williams was appointed Class Representative.  (*Id*.)  The Court denied

6

Plaintiff's motion to reconsider the Order certifying the class.  (Dkt. Nos. 143, 144.)

7

      As discussed above, it was later determined that Williams' phone number was not

8

"obtained by Prospects DM from Yodel Technologies, LLC or Fluent, Inc." under the class

9

definition, thus making him not a member of the class he represented.  (Dkt. No. 178 at 12.)

10

Williams moved to modify the class definition (Dkt. No. 178) while PillPack moved to decertify

11

the class (Dkt. No. 187).  The Honorable Robert J. Bryan denied Williams' motion and granted

12

PillPack's, decertifying the class.  (Dkt. No. 220.)  Williams has now filed a renewed Motion for

13

Class Certification (Dkt. No. 228) and Defendant has filed this Motion for Summary Judgment

14

(Dkt. No. 252.)

15

## III       DISCUSSION

16

### A. Summary Judgment Standard

17

      Summary judgment is appropriate if there is no genuine dispute as to any material fact

18

and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The

19

moving party bears the initial burden of demonstrating the absence of a genuine issue of material

20

fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When the moving party will have the

21

burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could

22

find other than for the moving party.  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th

23

Cir. 2007).  On an issue where the nonmoving party will bear the burden of proof at trial, the

24

1    moving party can prevail merely by pointing out to the district court that there is an absence of

2    evidence to support the non-moving party's case.  *Celotex Corp.*, 477 U.S. at 325.  If the moving

3    party meets the initial burden, the opposing party must set forth specific facts showing that there

4    is a genuine issue of fact for trial to defeat the motion.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

5    242, 250 (1986).  The court must view the evidence in the light most favorable to the nonmoving

6    party and draw all reasonable inferences in that party's favor.  *Reeves v. Sanderson Plumbing*

7    *Prods.*, 530 U.S. 133, 150–51 (2000).

8        **B.  Liability Under the TCPA**

9        Courts may hold sellers, like PillPack, vicariously liable for the TCPA violations of third-

10   party callers "where the plaintiff establishes an agency relationship, as defined by federal

11   common law, between the defendant and the third-party caller."  *Henderson v. United Student*

12   *Aid Funds, Inc.*, 918 F.3d 1068, 1072 (9th Cir. 2019), *as amended on denial of reh'g and reh'g*

13   *en banc* (May 6, 2019) (quotations omitted); *In the Matter of the Joint Petition Filed by Dish*

14   *Network, LLC*, 28 F.C.C. Rcd. 6574, 6584 (2013) ("[W[e find that the seller may be held

15   vicariously liable under federal common law principles of agency for TCPA violations

16   committed by third-party telemarketers.").  Courts in the Ninth Circuit rely on the Restatement

17   (Third) of Agency ("Restatement") for common law agency principles.  *Henderson*, 918 F.3d at

18   1072–73.

19       A plaintiff can establish an agency relationship using the "bedrock theories of agency,"

20   including actual authority, apparent authority, and ratification.  *See Jones v. Royal Admin. Servs.,*

21   *Inc.*, 887 F.3d 443, 449 (9th Cir. 2018); *see also Dish Network, LLC*, 28 F.C.C. Rcd. at 6584

22   ("[A] seller may be liable for violations by its representatives under a broad range of agency

23   principles, including not only formal agency, but also principles of apparent authority and

24

ratification.").  The party relying on an agency theory of liability bears the burden of establishing

the existence of an agency relationship.  Restatement § 4.06 cmt. b.

Williams argues PillPack is vicariously liable for Prospects DM's Unknown Vendor's

TCPA violations under theories of actual authority, apparent authority, and ratification.  (*See*

*generally* Dkt. No. 254.)  Whether PillPack was in an agency relationship with Prospects DM's

Unknown Vendor is a question of fact relevant to actual authority and ratification.

### C.  There is a Genuine Issue of Material Fact as to Whether Prospects DM's Unknown Vendor was in an Agency Relationship with PillPack

"Agency is the fiduciary relationship that arises when one person (a 'principal') manifests

assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject

to the principal's control, and the agent manifests assent or otherwise consents so to

act."  Restatement § 1.01.  A key principle of any agency relationship is control, especially when

determining whether vicarious liability exists.  *See Jones*, 887 F.3d at 450 ("In determining

whether vicarious liability may be imposed, the 'extent of control exercised by the [principal]' is

the 'essential ingredient.'") (quoting *United States v. Bonds*, 608 F.3d 495, 505 (9th Cir. 2010)

(alterations in original)).  "[B]ut the content or specific meaning of the right varies."

Restatement § 1.01.  "Thus, a person may be an agent although the principal lacks the right to

control the full range of the agent's activities, how the agent uses time, or the agent's exercise of

professional judgment."  *Id*.

"A subagent is a person appointed by an agent to perform functions that the agent has

consented to perform on behalf of the agent's principal and for whose conduct the appointing

agent is responsible to the principal."  *Id*. § 3.15.  An agent may appoint a subagent if the agent

has actual or apparent authority from the principal to do so.  *See id*.

Williams argues that "[a] reasonable jury could find that Performance Media was PillPack's agent" and that "Performance Media's vendors were PillPack's subagents." (Dkt. No. 254 at 18–21.) On PillPack's previous motion for summary judgment, Judge Zilly determined that "Plaintiff's evidence raises genuine disputes of fact on whether Defendant gave actual authorization, express or implied, to Performance Media to allow a third party to make unlawful calls on Defendant's behalf." (Dkt. No. 126 at 2.) The Court finds that PillPack has presented no new evidence or arguments to alter the Court's previous decision.

    1.  <u>There is a genuine issue of material fact as to whether Performance Media was PillPack's agent.</u>

The Parties dispute whether PillPack exhibited the requisite control over Performance Media necessary for an agency relationship.[1] PillPack argues Performance Media was not its agent because the terms of their agreement identified Performance Media as an "independent contractor" that used its own discretion to perform the contracted services. (Dkt. No. 252 at 18.)

Whether Performance Media was labeled an independent contractor in the agreement with PillPack does not foreclose a finding that an agency relationship existed. *Henderson*, 918 F.3d at 1073 ("[W]hether an agency relationship exists is for a court to decide based on an assessment of the facts of the relationship and not based on how the parties define their relationship") (citing Restatement § 1.02).

Citing *Jones*, PillPack argues that it "(i) had no day-to-day involvement with Performance Media, its subcontractor Prospects DM, or Prospects DM's subcontractors, (ii) did not supervise how Performance Media, its subcontractor Prospects DM, or Prospects DM's

---

[1] Based on the briefing before the Court, Judge Zilly presumed Performance Media was PillPack's agent. (Dkt. No. 126 at 2.) As PillPack has made clear that it disputes that any agency relationship existed between PillPack and Performance Media, the Court addresses the issue here.

1    subcontractors did their work, and (iii) paid Performance Media based on successful transfers,

2    not hourly." (Dkt. No. 252 at 18–19.)  PillPack appears to rely on the ten-factor test created in

3    *Jones* for a finding of sufficient control over an agent.  But PillPack's reliance on this test is

4    misplaced as the Ninth Circuit made clear that the test was only relevant to the question of

5    vicarious liability via an employer relationship.  *Jones*, 887 F.3d at 451 n.4 ("We emphasize that

6    our decision to adopt these Restatement factors is limited to the issue before the court. These

7    factors are of use for determining whether a principal, who has hired third-party telemarketers,

8    exercises sufficient control to be held vicariously liable under the TCPA *to the same degree that*

9    *an employer may be held liable for the actions of its employees*. . . . We express no opinion on

10   the usefulness of these factors in establishing other common law theories for holding a principal

11   liable for the conduct of its agent.") (emphasis in original).  As Williams does not allege such a

12   relationship, the *Jones* factors are not controlling.  *See Brown v. DirecTV, LLC*, 562 F. Supp. 3d

13   590, 608 (C.D. Cal. 2021).

14          Williams has put forth evidence that PillPack could control the timing and volume of the

15   leads it received by communicating with Performance Media.  (Dkt. Nos. 229-27; 98-13; 98-14;

16   98-15.)  Williams also put forth evidence that PillPack had the ability to review the quality of

17   leads being received by PillPack.  (Dkt. No. 255-3 at 6–8; *see generally* Dkt. No. 62.)  The

18   evidence also suggests Performance Media would make changes to its services based on

19   feedback from PillPack.  (*Id*.)  Williams also puts forth evidence that PillPack participated in

20   approval of the script used by the avatar on the calls.  (Dkt. Nos. 98-2 at 16–17; 229-5 at 22;

21   229-21 at 2.)

22

23

24

ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 252) - 11

1
2
3

Viewed in the light most favorable to Williams, Williams has put forth evidence raising a genuine issue of material fact whether PillPack exhibited sufficient control over Performance Media to make Performance Media its agent.

4
5

        2.  <u>There is a genuine issue of material fact whether Prospects DM's Unknown Vendor was a subagent of an agent of PillPack.</u>

6
7
8
9
10

As previously noted, an agent may appoint a subagent to complete tasks that the agent has agreed to do on behalf of the principal. *See* Restatement § 3.15.  An agent may appoint a subagent if the agent has actual or apparent authority from the principal to do so.  *See id*.  "If an agent acts without actual or apparent authority in purporting to appoint a subagent, the person so appointed is the agent solely of the appointing agent and is not the principal's subagent unless the principal ratifies the appointment."  *Id*. § 3.15 cmt c.

11
12
13
14

"An agent has actual authority to create a relationship of subagency when the agent reasonably believes, based on a manifestation from the principal, that the principal consents to the appointment of a subagent."  *Id*.  A principal's consent to the appointment of a subagent may be express or implied.  *Id*.

15
16
17
18
19
20
21
22
23

Williams argues that PillPack is vicariously liable for Prospects DM's Unknown Vendor's TCPA violations because the Unknown Vendor was PillPack's subagent.  (Dkt. No. 254 at 20–21.)  According to Williams, "the evidence shows that Performance Media reasonably believed PillPack consented to Performance Media appointing Prospects and its vendors to place the calls."  (*Id*. at 20.)  PillPack argues that Prospects DM's Unknown Vendor could not be PillPack's subagent because there is no evidence Performance Media controlled the Unknown Vendor or that Prospects DM was in an agency relationship with PillPack.  (Dkt. No. 257 at 7–8.)

24

1    Willliams has put forth evidence that the contract between PillPack and Performance

2    Media allowed Performance Media to use "agents" and "contractors" to carry out its duties on

3    behalf of PillPack.  (Dkt. No. 229-26 at 5–7.)  Williams has also put forth deposition testimony

4    of Christina Anderson, a third-party who introduced PillPack to Performance Media.  (*See* Dkt.

5    No, 229-7.)  Ms. Anderson testified that she was on calls with representatives from PillPack and

6    Performance Media where Josh Grant, CEO of Prospects DM, was on the call and that

7    Performance Media introduced Grant to PillPack as the entity that would be placing the calls on

8    behalf of PillPack.  (*Id.* at 15–17.)  Williams has also put forth an email from Mark Dorf, CEO of

9    Performance Media, to Grant explaining that Dorf spoke to PillPack about using Prospects DM's

10   "offshore and onshore" vendors and PillPack was "ok with using the offshore [vendors] only to

11   keep the cost down[.]"  (Dkt. No. 98-8 at 2.)  PillPack was also aware at least some calls were

12   being made on behalf of "Helping Hands," a DBA of Yodel.  (Dkt. No. 255-3 at 13.)

13   Viewed in the light most favorable to Williams, the communications between PillPack,

14   Performance Media, and Prospects DM could give the reasonable impression that PillPack gave

15   authority to both Performance Media and Prospects DM to hire subagents to carry out the media

16   campaign on behalf of PillPack.  As a result, if a jury finds that PillPack and Performance Media

17   were in an agency relationship, a jury could also find that PillPack authorized Performance

18   Media to engage Prospects DM and its subcontractors, and PillPack accepted the legal

19   consequences of their actions.

20   **D.  There is a Genuine Issue of Material Fact as to Whether Prospects DM's Unknown Vendor Had Actual Authority to Make the Calls to Williams**

21   To establish actual authority under the TCPA, plaintiffs must not only establish an

22   agency relationship, "[t]hey must also establish actual authority to place the unlawful calls."

23   *Jones*, 887 F.3d at 449.  "An agent acts with actual authority when, at the time of taking action

24

1   that has legal consequences for the principal, the agent reasonably believes, in accordance with

2   the principal's manifestations to the agent, that the principal wishes the agent so to act."

3   Restatement § 2.01.  Actual authority is limited to actions "specifically mentioned to be done in a

4   written or oral communication" or "consistent with" a principal's "general statement of what the

5   agent is supposed to do."  *Jones*, 887 F.3d at 449 (quoting *Salyers v. Metro. Life Ins. Co.*, 871

6   F.3d 934, 940 (9th Cir. 2017)).

7        As discussed above, there is a genuine dispute of material fact as to whether the party

8   placing the calls to Williams was in an agency relationship with PillPack.  *See supra* Section

9   III.C.  PillPack also moves for summary judgment arguing that the Unknown Vendor that placed

10  the calls to Williams did not have actual authority to make calls in violation of the TCPA.  (Dkt.

11  No. 252 at 17–22.)

12        Williams argues that PillPack's conduct gave Performance Media, and its subagents,

13  implied actual authority to make calls in violation of the TCPA.  (Dkt. No. 257 at 21–24.)

14  PillPack argues that neither Performance Media, Prospects DM, or its vendors had actual

15  authority to place the unlawful calls on behalf of PillPack.  (Dkt. No. 252 at 15–21.)  Citing

16  *Jones*, PillPack argues the express terms of the agreement between PillPack and Performance

17  Media forecloses a finding of express authority to make calls in violation of the TCPA.  (*Id.* at

18  17–19.)  PillPack also argues that none of its words or actions could have been reasonably

19  interpreted to give Prospects DM, or its vendors, implied actual authority to make calls in

20  violation of the TCPA.  (Dkt. No. 257 at 8–11.)

21        Williams has put forth evidence that PillPack authorized the use of prerecorded messages

22  on the calls to leads.  (Dkt. Nos. 229-18; 255-3 at 3–4.)  Williams has also put forth evidence that

23  some leads were being called that had not given PillPack express consent to call them.  (Dkt. No.

24

1    229-5 at 17–20.)  If these two practices were used on the same lead that would violate the TCPA.

2    (*See* Dkt. No. 140 at 13–14.)  Thus, there is a genuine issue of material fact whether the

3    Unknown Vendor who placed the calls to Williams had implied actual authority to place the calls

4    to leads using an avatar or prerecorded message without obtaining prior express written consent.

5           PillPack relies on *Jones* in arguing that the agreement between PillPack and Performance

6    Media forecloses a finding of actual authority because it required Performance Media and its

7    agents to comply with the TCPA.  (Dkt. No. 252 at 18.)  In *Jones*, the contract between the

8    defendant and its agent "expressly prohibited any act or omission that violates applicable state or

9    Federal law, including but not limited to robo-calling."  887 F.3d at 449 (internal quotation

10   marks omitted).  But the Ninth Circuit also found that plaintiffs failed to point to any evidence on

11   the record "contradicting this limitation" on the agent's authority.  *Id*.  *Jones* does not foreclose

12   the possibility that PillPack made other implied manifestations to Performance Media or any

13   subagents that they reasonably believed gave them authority to make calls in violation of the

14   TCPA.

15          Similarly, the Court is not persuaded by PillPack's reliance on *Abante* and *Makaron* that

16   an agreement to provide TCPA compliant leads forecloses the possibility of actual authority to

17   make calls in violation of the TCPA.  In both *Abante* and *Makaron,* the plaintiffs failed to put

18   forth any evidence rebutting the understanding that the lead generation activities would comply

19   with federal law.  *Abante Rooter & Plumbing, Inc. v. Arashi Mahalo, LLC*, 2019 WL 6907077,

20   at *1 (N.D. Cal. Dec. 19, 2019); *Makaron v. GE Sec. Mfg., Inc.*, 2015 WL 3526253, at *6 (C.D.

21   Cal. May 18, 2015).  *Abante* is also factually distinct because actual authority was not a theory of

22   vicarious liability raised by the plaintiff, in part because there was "unrebutted evidence" that the

23   lead generator "repeatedly represented that its services were compliant with the TCPA."  *Abante*,

24

2019 WL 6907077, at *1.  In *Makaron*, the only evidence of defendant's control over the agents were the agreements for the licenses for its authorized dealers that required compliance "with all local, state, and federal laws in their marketing and sales tactics."  *Makaron*, 2015 WL 3526253, at *6.  Unlike the plaintiffs in either of those cases, Williams has put forth evidence rebutting PillPack's contention that it only authorized TCPA-compliant leads.

Thus, the Court finds that there is a genuine issue of material fact as to whether Prospects DM's Unknown Vendor acted with actual authority in making the calls to Williams.

### E.  There is a Genuine Issue of Material Fact as to Whether PillPack Ratified the Conduct of Prospects DM's Unknown Vendor

"Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority."  Restatement § 4.01.  Ratification occurs when the principal accepts the benefit of the agent's act either with actual knowledge of the material facts or with "knowledge of facts that would have led a reasonable person to investigate further, but the principal ratified without further investigation."  *Henderson*, 918 F.3d 1075 (quoting Restatement § 4.06 cmt. d).  The latter is also described as "willful ignorance."  *Id*.

To prove knowing acceptance, there must be "an objectively or externally observable indication . . . that the principal has exercised choice and has consented" to the acts of the purported agent.  Restatement § 4.01 cmt. d.  Consenting to the act requires the principal have "knowledge of material facts," or "actual knowledge."  *Id*. § 4.06.

A principal that is "willfully ignorant" might not know the material facts but ratifies "with awareness that such knowledge was lacking."  *Id*. § 4.01 cmt. b.  "In effect, the principal can ratify the act of a third party—thereby making the third party the principal's agent—even if

1    it does not know all the material facts, but it must be aware that it does not know the material

2    facts and ratify anyway."  *Henderson*, 918 F.3d at 1074.

3          Williams argues a reasonable jury could conclude that PillPack ratified the conduct of

4    Prospects DM's Unknown Vendor because PillPack "had actual knowledge that the calls were

5    placed without the prior express consent required by the TCPA."  (Dkt. No. 254 at 28.)

6    Alternatively, Williams argues "[t]here were numerous 'red flags,' that should have led PillPack

7    to investigate whether Performance Media or its subagents obtained prior express written

8    consent."  (*Id*.)

9          PillPack argues PillPack never ratified Prospects DM's Unknown Vendor's activity

10   because: 1) the calls placed to Williams were not a ratifiable act, 2) PillPack had no knowledge

11   or inquiry notice that Prospects DM's vendor was transferring calls to PillPack in violation of the

12   TCPA, and 3) PillPack received no benefit from the calls to Williams.  (Dkt. No. 252 at 24–29.)

13         "A person may ratify an act if the actor acted or purported to act as an agent on the

14   person's behalf."  Restatement § 4.03.  As there is a genuine issue of material fact whether

15   Prospects DM's Unknown Vendor was in an agency relationship with PillPack, the Court will

16   not grant PillPack's motion on this point.

17         PillPack also disputes that there is sufficient evidence to find that it had actual knowledge

18   or was on inquiry notice that the calls being transferred to it were placed in violation of the

19   TCPA.  As Judge Zilly's prior Order explained, PillPack knew that at least some leads

20   transferred to its call centers were called on behalf of PillPack without first giving proper consent

21   under the TCPA.  (Dkt. No. 140 at 13–14.)  Williams' Opposition has put forth evidence

22   supporting this finding.  (Dkt. Nos. 255-3 at 13; 229-5 at 18–20.)  Williams has also put forth

23   evidence that PillPack knew that a prerecorded voice would be used in the calls to leads.  (Dkt.

24

Nos. 229-5 at 9–10, 29; 229-9 at 3–4; 229-18; 255-3 at 6–7.)  Viewing this evidence in the light

most favorable to Williams, a triable fact remains as to whether PillPack "had knowledge of facts

that would have led a reasonable person to investigate further." *Henderson*, 918 F.3d at 1076

(quoting Restatement § 4.06 cmt. d).[2]

PillPack makes the argument that it did investigate complaints from leads and thus could

not have been willfully ignorant of unknown vendors' behavior.  (Dkt. No. 252 at 28.)  In

support, PillPack cites an email exchange between PillPack and Performance Media where

PillPack raises complaints from leads that say they are receiving robocalls.  (Dkt. No. 62 at 8.)

However, this evidence does not establish that PillPack was assured that the campaign run by

Performance Media and its vendors complied with the TCPA. Rather, this email indicates merely

that Performance Media reassured PillPack that all leads being transferred to it had shown they

wanted to be transferred to PillPack.  (Dkt. No. 62 at 8.)  The email exchange between

Performance Media and PillPack cited in support for PillPack's due diligence also does not

support PillPack's contention for similar reasons.  (*See, e.g.*, Dkt. No. 62 at 5–8.)  Whether by

design or oversight, the relationship between PillPack, Performance Media, and the vendors

making the calls prevented PillPack from being alerted to any issues of leads being contacted

without TCPA-compliant consent.  When PillPack's call center received a call, it would not

know which entity made the call on PillPack's behalf.  (Dkt. No. 84 at 2.)  And if that lead

complained that it had not given proper consent, it would not have been transferred to PillPack

unless it affirmatively said it was interested in PillPack's services.  (Dkt. No. 85 at 1–2.)

PillPack claims it kept a list of complaints made by leads, but those complaints were only written

---

[2] Unlike the lenders in *Kristensen v. Credit Payment Servs. Inc.*, Williams has put forth evidence that PillPack assumed the risk of lack of knowledge but ratified unlawful calls anyway.  879 F.3d 1010, 1015 (9th Cir. 2018).

down if they complained of being transferred to PillPack from the vendor, not that the vendor was called without express consent under the TCPA.  (Dkt. No. 62 at 2.)

PillPack also argues that it did not ratify the conduct of Prospects DM's vendors because it did not receive any benefit from Williams' calls.  (Dkt. No. 252 at 28–29.)  For ratification to occur, there must be "knowing acceptance of the benefit."  *See Henderson*, 918 F.3d at 1073 (quoting Restatement § 401 cmt. d).  Williams argues PillPack has continued to accept thousands of leads from Performance Media despite consumer complaints.  (Dkt. No. 254 at 30.)  Williams argues that under *Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.,* 2018 WL 3707283, at *5 (N.D. Cal. Aug. 3, 2018), and *Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817 (N.D. Ill. 2016), such evidence presents a jury question on ratification under an "acceptance of benefits" theory.

PillPack accurately responds that in those cases the class was already certified in the cases cited by Williams.  But the inquiry does not end there.  Williams has put forth evidence that PillPack accepted at least one of the calls made to Williams.  (Dkt. No. 64 at 36–40.)  PillPack has put forth no binding authority that a benefit under a theory of ratification must result in the purchase of goods or services.  From the Court's perspective, when it accepted the transfer of the first Williams call PillPack believed it was speaking with a potential buyer of PillPack products.  There is at least some benefit to speaking with a lead as PillPack was paying Performance Media for successful transfers to its call centers, regardless of whether those leads turned into actual sales.  (Dkt. No. 37-13 at 2–4.)

Thus, the Court finds there is a genuine issue of material fact as to whether PillPack ratified the conduct of Prospects DM's Unknown Vendor.

1

**IV      CONCLUSION**

2        Accordingly, and having considered Defendant's motion (Dkt. No. 252), the briefing of

3   the parties, and the remainder of the record, the Court finds and ORDERS that Defendant's

4   Motion for Summary Judgment is DENIED.

5        Dated this 5th day of December 2022.

6

7

8                                                David G. Estudillo
                                                 United States District Judge
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 252) - 20